*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0015A (6th Cir.)
File Name: 04a0015a.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

WENDY MCMULLEN,
*Plaintiff-Appellant,*

*v.*

No. 01-1211

MEIJER, INCORPORATED,
*Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 99-71206—Anna Diggs Taylor, District Judge.

Argued: February 7, 2003

Decided and Filed: January 14, 2004

Before: GILMAN and GIBBONS, Circuit Judges;
ECONOMUS, District Judge.[*]

_____

### COUNSEL

**ARGUED:** Patrick M. Kirby, Flint, Michigan, for Appellant.
Jeffrey Scott Rueble, ASSISTANT GENERAL COUNSEL,

---

[*] The Honorable Peter C. Economus, United States District Judge for the Northern District of Ohio, sitting by designation.

MEIJER, Grand Rapids, Michigan, for Appellee.
**ON BRIEF:** Patrick M. Kirby, Flint, Michigan, for Appellant. Jeffrey Scott Rueble, ASSISTANT GENERAL COUNSEL, MEIJER, Grand Rapids, Michigan, for Appellee.

_____

### AMENDED OPINION

_____

PER CURIAM. Appellant Wendy McMullen brought this action against her former employer, Meijer Inc., seeking a declaratory judgment that her Title VII claims are not subject to the mandatory pre-dispute arbitration agreement she signed upon accepting employment with Meijer. Although McMullen acknowledges that the terms of the arbitration agreement cover her statutory employment discrimination claims, she contends that the arbitration agreement is unenforceable with regard to her Title VII claims because it grants Meijer exclusive control over the pool of potential arbitrators from which the arbitrator is selected.

After initially denying Meijer's summary judgment motion, the district court reconsidered and granted summary judgment in favor of Meijer in light of a perceived change in controlling case law. McMullen appeals the grant of summary judgment in favor of Meijer and also the denial of her summary judgment motion. We reverse both rulings because we find that Meijer's exclusive control over the pool of potential arbitrators prevents McMullen from effectively vindicating her statutory rights. However, we also find that an issue remains as to whether the arbitrator-selection provision can be severed from the rest of the arbitration agreement. Therefore, we remand to the district court for further proceedings consistent with this opinion.

## I.

In 1989, Meijer hired McMullen as a store detective at its store in Flint, Michigan. McMullen faced discipline in 1998 for an incident involving her pursuit and confrontation of a juvenile shoplifter in the store parking lot. Meijer offered McMullen a choice between demotion with a 33% decrease in salary, or outright termination. McMullen chose termination and decided to challenge her discipline through Meijer's termination appeal procedure (TAP).

The terms of the TAP establish a two-step procedure requiring binding arbitration of all disputes arising out of termination of employment. The TAP expressly incorporates the Employment Dispute Resolution Rules of the American Arbitration Association (AAA).[1] Further, the TAP specifically asserts that:

> This procedure is intended to be the sole and exclusive remedy and forum for all claims arising out of or relating to an eligible team member's termination from employment.

> The decision and award of the arbitrator is final and binding between the parties as to all claims arising out of or relating to an [sic] team member's termination from employment which were or could have been raised at any step in this procedure and judgment may be entered on the award in any circuit court or other court of competent jurisdiction.

Contemporaneous to hiring McMullen, Meijer had provided her with a copy of an employee handbook describing both the TAP and the company's policy of terminating employees only with "just cause." McMullen had

---

[1] The American Arbitration Association, a non-profit public service organization, assists in the design of alternative dispute resolution systems for corporations, unions, government agencies, law firms and the courts.

then signed a form acknowledging receipt of the handbook and assenting to the company's policies and procedures.

Upon instituting termination appeal proceedings, McMullen argued that her discharge had been motivated by an intent to discriminate against her on the basis of her gender. Meijer denied her appeal internally and informed her that, "[i]f you would like to contest the results of this further review, you must request an arbitration hearing . . . ." Subsequently, McMullen signed and filed the necessary paperwork to begin the arbitral process.

Once an arbitration hearing is requested, the TAP grants Meijer the right to unilaterally select a pool of at least five potential arbitrators, each of whom must be: (1) an attorney, (2) unemployed by and unaffiliated with the company, (3) generally recognized as a neutral and experienced labor and employment arbitrator, and (4) listed on the rosters of the Federal Mediation and Conciliation Service (FMCS) or the AAA, as well as other arbitration rosters.[2] Then, counsel for the company and the aggrieved employee mutually select an arbitrator from that pool by alternatively striking names until only one remains. On August 20, 1998, counsel for McMullen and Meijer, following this procedure, selected arbitrator William Daniel to hear McMullen's appeal.[3]

Several months later, and only one day prior to the scheduled date of the arbitration hearing, McMullen filed this declaratory judgment action in state court challenging the fairness of the TAP's arbitrator-selection process. Asserting federal question jurisdiction, Meijer removed the action to the

---

[2] At the time McMullen initiated the TAP process, Meijer maintained a standing panel of potential arbitrators that it used for every arbitration in which it participated in the state of Michigan.

[3] As a member of Meijer's standing panel of potential arbitrators in Michigan, Daniel had served as the arbitrator in seven arbitrations involving Meijer by the time McMullen initiated the TAP process.

United States District Court for the Eastern District of Michigan.

On December 13, 1999, Meijer brought a motion to compel arbitration and for summary judgment. On March 23, 2000, the district court denied both motions from the bench. The court's ruling indicated that the procedures used by Meijer to select an arbitrator did not comport with the requisite level of fairness for such mandatory-arbitration contracts to be binding. In conjunction with its decision, the court criticized the extent of control exercised by Meijer over the arbitral panel. The court also stated, "I'm sorry that there were not cross motions in the case. There weren't, so we'll still have this case alive here."

On September 21, 2000, McMullen moved for summary judgment. On October 2, 2000, Meijer moved for reconsideration of its earlier motions based on this court's intervening decision in *Haskins v. Prudential Insurance Company of America*, 230 F.3d 231 (6th Cir. 2000). The district court held a hearing on the motions on November 27, 2000, and subsequently denied McMullen's motion for summary judgment, granted Meijer's motion for reconsideration, and, upon reconsideration, granted Meijer's motions for summary judgment and to compel arbitration.[4]

---

[4] The district judge's decisions on the motions for summary judgment consisted of brief oral rulings from the bench, rather than written opinions. With regard to the propriety of issuing oral rulings on summary judgment motions, unaccompanied by written findings, this court previously has noted:

> This reviewing court, and more importantly, the parties, are much better served when, as is the custom in this circuit, the district court prepares a written opinion explaining its ruling and the reasoning, factual and legal, in support, especially when the ruling disposes of the case in a final judgment.

*Peck v. Bridgeport Machines, Inc.*, 237 F.3d 614, 617 (6th Cir. 2001). This observation is equally appropriate here.

## II.

The district court's decision to grant Meijer's motion for summary judgment is reviewed *de novo*, *Smith v. Ameritech*, 129 F.3d 857, 863 (6th Cir. 1997), as is the district court's decision to grant Meijer's motion to compel arbitration, *Wiepking v. Prudential-Bache Securities, Inc.*, 940 F.2d 996, 998 (6th Cir. 1991). Similarly, the district court's decisions regarding the existence of a valid arbitration agreement and the arbitrability of a particular dispute are reviewed *de novo*. *Floss v. Ryan's Family Steakhouses, Inc.*, 211 F.3d 306, 311 (6th Cir. 2000). A district court's denial of summary judgment is an interlocutory order that is not ordinarily appealable, but when the appeal from a denial of summary judgment is presented together with an appeal from a grant of summary judgment, we have jurisdiction to review the denial. *Thomas v. United States*, 166 F.3d 825, 828 (6th Cir. 1999). When a district court denies a motion for summary judgment because it determines that there exists a genuine issue of material fact, we review the denial only for an abuse of discretion. *Garner v. Memphis Police Dep't*, 8 F.3d 358, 363 (6th Cir. 1993). When, however, the district court denies summary judgment based solely upon legal grounds, we review the denial *de novo*. *Id.* Because the district court denied McMullen's summary judgment motion solely upon legal grounds, we review this denial *de novo*.

The Supreme Court has held that agreements to arbitrate employment disputes as a condition of employment are generally enforceable under the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* (FAA). *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 109 (2001). This court has consistently upheld the validity of pre-dispute mandatory arbitration agreements. *Haskins*, 230 F.3d at 239; *Willis v. Dean Witter Reynolds, Inc.*, 948 F.2d 305, 310 (6th Cir. 1991). It is well settled that judicial protection of pre-dispute arbitral agreements extends to agreements to arbitrate statutory employment discrimination claims. *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991);

*Willis*, 948 F.2d at 312. Arbitration of statutory claims is appropriate because "[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." *Gilmer*, 500 U.S. at 26 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985)).

Notwithstanding a general policy favoring such agreements, there are circumstances under which courts will not enforce pre-dispute mandatory arbitration agreements with regard to statutory employment discrimination claims. In *Floss*, we held that, "even if arbitration is generally a suitable forum for resolving a particular statutory claim, the specific arbitral forum provided under an arbitration agreement must nevertheless allow for the effective vindication of that claim." *Floss*, 211 F.3d at 313. The central issue in this case is whether Meijer's exclusive control over the pool of potential arbitrators renders the arbitral forum so fundamentally unfair as to prevent McMullen from effectively vindicating her statutory rights, thereby precluding enforcement of the pre-dispute agreement to arbitrate the statutory claims.

Before reaching this central issue, however, we must address two preliminary arguments made by Meijer. First, Meijer argues that, regardless of the viability of the pre-dispute agreement, McMullen should be compelled to arbitrate her claims because she voluntarily and knowingly agreed to arbitration *after* the dispute had occurred. When Meijer internally reviewed McMullen's claim after her termination, it issued a "results of review" statement on a Meijer "Termination Appeal Form." The form states that to challenge the termination, an employee must request arbitration. Part 3 of the form states, "I request that my case be submitted to arbitration in accordance with the Company's Termination Appeal Procedure." Beneath this statement, the form is signed solely by Wendy McMullen.

McMullen did not agree to waive any right to sue by signing this form. The form was merely an administrative step required to initiate the arbitration process that McMullen agreed to upon her hire. The form itself does not constitute an arbitration agreement because it contains no promise not to sue on behalf of either party. Moreover, the form does not constitute an enforceable agreement because it lacks contractual consideration. It is an elemental tenet of Michigan contract law, which applies here, that past consideration cannot serve as legal consideration for a subsequent promise. *Shirey v. Camden*, 22 N.W.2d 98, 102 (Mich. 1946). Meijer did not offer McMullen any new consideration in return for signing the form, which Meijer did not sign.

Meijer's second preliminary argument is that our decision in *Haskins* prevents us from considering whether a pre-dispute arbitration agreement allows for the effective vindication of statutory claims. Meijer notes that we decided *Haskins* after we decided *Floss*. In *Haskins*, this court held that "absent a showing of fraud, duress, mistake, or some other ground upon which a contract may be voided, a court must enforce a contractual agreement to arbitrate." *Haskins*, 230 F.3d at 239. Meijer requests that we construe *Haskins* narrowly, arguing that McMullen can only escape from her agreement to arbitrate by showing "fraud, duress, or mistake." In other words, Meijer contends that McMullen cannot ask a court to "inquire into the fairness of the terms of these arbitration contracts and to void them because one of their terms - the method of selecting the arbitrator - is allegedly unfair to her." The district court concurred with Meijer, opining that "*Haskins* has substantially narrowed the grounds on which one may challenge a contractual agreement to arbitrate." Consequently, the district court granted Meijer's motion for reconsideration.

The district court's ruling, however, overstates the impact of *Haskins* on the agreement signed by McMullen. In *Haskins*, the plaintiff signed an agreement with a securities

dealers' association binding him to arbitrate any disputes arising with his employer. The plaintiff's challenge to the agreement focused on his ignorance as to the existence of the mandatory arbitration agreement, rather than on any perceived unfairness in the arbitration process. *Haskins*, 230 F.3d at 239-40. The *Haskins* court adopted a contracts-law approach to determining the validity of the agreement, holding that, despite plaintiff's ignorance, the agreement was enforceable absent fraud, mistake, duress, or another contractual ground for challenge.

In arguing that McMullen can only escape arbitration by showing fraud, mistake, or duress, Meijer ignores the remaining portion of the holding in *Haskins*, where this court made an allowance for "some other ground upon which a contract may be voided." *Haskins*, 230 F.3d at 239. This language sufficiently encompasses the "effective vindication" analysis prescribed by the United States Supreme Court and endorsed by this circuit in *Floss*.[5] Indeed, subsequent cases have arrived at this precise conclusion, construing the *Floss* "effective vindication" analysis as another ground on which a mandatory arbitration agreement can be voided. *See Cooper v. MRM Inv. Co.*, 199 F.Supp.2d 771, 775 (M.D. Tenn. 2002); *French v. First Union Sec., Inc.*, 209 F. Supp. 2d 818, 826 (M.D. Tenn. 2002); *Rembert v. Ryan's Steakhouse*, 596 N.W.2d 208, 218 (Mich. Ct. App. 1999).[6]

---

[5]The "effective vindication" test referenced in *Floss* derives from *Gilmer*, where the Supreme Court proclaimed, "[S]o long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function." *Gilmer*, 500 U.S. at 28 (quoting *Mitsubishi Motors Corp.*, 473 U.S. at 637).

[6]Although the *Rembert* decision predated *Haskins*, it did not predate *Beauchamp v. Great West Life Assurance Co.*, 918 F.Supp. 1091 (E.D. Mich. 1996), the underlying case on which *Haskins* rested its holding. Indeed, the language in *Haskins* stating that "absent a showing of fraud, duress, mistake or some other ground upon which a contract may be

For example, in *Cooper*, the court extensively discussed *Haskins* in the course of assessing the validity of a pre-dispute agreement to arbitrate signed by a restaurant employee. In so doing, the court essentially divided the *Haskins* analysis into two separate stages. First, it undertook the *Haskins* contractual analysis that Meijer promotes in the instant appeal as the only means for invalidating such an agreement. Secondly, contrary to the position Meijer espouses, the court held that:

> Even if this Court found no contractual defenses to the enforcement of the [arbitration agreement], Plaintiff's substantive rights are affected by the agreement. Courts have recognized that, although arbitration agreements are generally favored, they will not be enforced if they affect an individual's substantive rights. *Gilmer*, 500 U.S. at 28, 111 S.Ct. 1647. Where an individual is unable to vindicate his or her rights because of an obstacle erected by an arbitration agreement, the court may not enforce that arbitration agreement.

*Cooper*, 199 F. Supp. 2d at 780-81.

Furthermore, even if Meijer's interpretation of *Haskins* were correct, *Haskins* has been superseded by our *en banc* decision in *Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646 (6th Cir. 2003). As we held in *Morrison*, "[t]he Supreme Court has made clear that statutory rights, such as those created by Title VII, may be subject to mandatory arbitration only if the arbitral forum permits the effective vindication of those rights." 317 F.3d at 658. "Under *Gilmer*, the arbitral forum must provide litigants with an effective substitute for the judicial forum. . . ." *Id.* at 659.

---

voided, a court must enforce a contractual agreement to arbitrate," is adopted from *Beauchamp*, 918 F.Supp. at 1098. Thus, the *Rembert* court's conclusion that *Beauchamp* permits a fairness challenge to an arbitration agreement applies with equal force to *Haskins*.

Therefore, we must decide whether Meijer's TAP provides McMullen with an effective substitute for the judicial forum to pursue her Title VII claims. The TAP adopted by Meijer is commendably fair except in one important respect: it grants Meijer unilateral control over the pool of potential arbitrators.

McMullen relies heavily on *Hooters of America v. Phillips*, 173 F.3d 933 (4th Cir. 1999), to support her argument that Meijer's TAP is so unfair that it does not provide an effective means of vindicating her Title VII rights. In *Hooters*, the Fourth Circuit invalidated an arbitration agreement that it found "so one-sided that [its] only possible purpose [was] to undermine the neutrality of the proceeding." *Id*. at 938. The *Hooters* court stated, "By promulgating [a] system of warped rules, Hooters so skewed the process in its favor that Phillips has been denied arbitration in any meaningful sense of the word." *Id*. at 941.

Many of the arbitration procedures criticized by the Fourth Circuit in *Hooters* were patently one-sided. For example, the arbitration agreement at issue in *Hooters* required employees to file a notice of the particulars of their claims, as well as a list of all fact witnesses along with a summary of their knowledge, while the company was required to do neither. *Hooters*, 173 F.3d at 938-39. The company could expand the scope of arbitration to any matter, but the employee could only arbitrate matters asserted in the notice of claim. The company, but not the employee, could create a record or transcript of the proceeding. The company also retained the sole right to cancel the arbitration agreement or bring suit in court to vacate or modify the arbitration award. Finally, the company could unilaterally modify the rules at any time without notice to the employee, even in the middle of an arbitration hearing. *Id.*

Moreover, the selection process in *Hooters* "[was] crafted to ensure a biased decisionmaker." *Hooters*, 173 F.3d at 938.

The *Hooters* court described the selection procedure as follows:

> The employee and Hooters each select an arbitrator, and the two arbitrators in turn select a third. Good enough, except that the employee's arbitrator and the third arbitrator must be selected from a list of arbitrators created exclusively by Hooters. This gives Hooters control over the entire panel and places no limits whatsoever on whom Hooters can put on the list. Under the rules, Hooters is free to devise lists of partial arbitrators who have existing relationships, financial or familial, with Hooters and its management. In fact, the rules do not even prohibit Hooters from placing its managers themselves on the list.

*Id*. at 938-39.

In addition to *Hooters*, McMullen cites our opinion in *Floss* in support of her argument that Meijer's TAP should not be enforced in this case. In *Floss*, this court invalidated an arbitration agreement that gave a third-party arbitration service, EDSI, complete discretion over the procedures and rules to be used during arbitration hearings. *Floss*, 211 F.3d at 310. Because EDSI could change those rules without notice, and without the consent of the claimant, we held that the agreement to arbitrate lacked consideration and mutuality of obligation. *Id*. at 315-16.

Our opinion in *Floss* also criticized, albeit in *dicta*, the fairness of EDSI's arbitrator-selection process. Under EDSI's rules, three "adjudicators" were selected from three separate selection pools to preside over the arbitration hearing. The first of these pools consisted of supervisors and managers from another EDSI signatory company; the second consisted of employees from another signatory; and the third contained attorneys, retired judges, and other "competent professional persons." *Id*. at 313-14 n.7. As described by the *Floss* court:

The selection process begins with EDSI furnishing both parties a list of potential adjudicators organized according to each selection pool. Information regarding each adjudicator's recent employment history and related biographical information is provided to the parties along with this list. The parties may then move to strike any adjudicator for cause. Following the removal of any adjudicators for cause, the parties each strike a name from the list until only one name remains from each selection pool.

*Id.*

Although this process appears facially reasonable, we expressed our "serious reservations as to whether the arbitral forum provided under the current version of the EDSI Rules and Procedures is suitable for the resolution of statutory claims." *Id.* at 314. Specifically, we observed that "the neutrality of the forum is far from clear in light of the uncertain relationship between [the employer] and EDSI." *Id.* The record did not reflect whether EDSI, in contrast to the AAA, was a for-profit entity, but we questioned whether an alleged financial relationship between the employer company and EDSI, compounded by the latter's pecuniary interest in retaining its arbitration service contract, might foster bias in favor of the employer client. Most significantly to the present case, we found in *Floss* that "[i]n light of EDSI's role in determining the pool of potential arbitrators, any such bias would render the arbitral forum fundamentally unfair." *Id.* (citing *Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465, 1482 (D.C. Cir. 1997) ("At a minimum, statutory rights include both a substantive protection and access to a neutral forum in which to enforce those protections.")).

Meijer's TAP is plainly more even-handed than the arbitration agreement at issue in *Hooters*, which allowed for unfettered employer control over the potential arbitral panel and contained a myriad of unilaterally biased clauses and rules, giving Hooters an advantage in every aspect of the

arbitration. But the arbitrator-selection process provided for under Meijer's TAP is less fair than the arbitrator-selection process described in *Floss* as "fundamentally unfair." *Id.* In *Floss*, a third-party company had exclusive control over the pool of potential arbitrators, while in the present case the employer has exclusive control over the selection pool. The *Floss* court was concerned that the company that selected the pool of potential arbitrators might be biased in favor of the employer, while here the company that selects the pool of potential arbitrators is the employer.

The type of control exercised by Meijer over the potential arbitrators is analogous to the "exclusive[] . . . control over the entire panel" exercised by the employer in *Hooters* and rejected by the Fourth Circuit. *Hooters*, 173 F.3d at 939. Furthermore, the arbitrator-selection procedure used by Meijer allows it to create the type of symbiotic relationship with its arbitrators that we feared would promulgate bias in *Floss*. *Floss*, 211 F.3d at 314. The risk of bias inherent in Meijer's procedure is demonstrated by the fact that Meijer uses the same panel of five to seven arbitrators in each arbitration hearing in which it participates in the state of Michigan. We find Meijer's exclusive control over the pool of potential arbitrators particularly problematic because Meijer could easily have adopted a procedure in which an unbiased third-party, such as the AAA or FMCS, selected the pool of potential arbitrators.

Meijer argues that the bias which McMullen fears will manifest itself during her arbitration hearing is, at this point, merely *potential* bias. This is not an insignificant argument. The Supreme Court, when presented with an allegation of hypothetical bias, "decline[d] to indulge the presumption that the parties and arbitral body conducting a proceeding will be unable or unwilling to retain competent, conscientious and impartial arbitrators." *Gilmer*, 500 U.S. at 30 (quoting *Mitsubishi*, 473 U.S. at 634). McMullen has not asserted that the particular arbitrator selected to hear her claim is biased

against her or that his arbitration decisions in the past have unreasonably favored Meijer.

McMullen's complaint here, however, goes beyond an allegation of a potentially biased arbitrator because McMullen cites a lack of fairness inherent in the arbitrator-selection process. The Supreme Court in *Gilmer* recognized that fair and impartial "arbitration rules . . . provide protections against biased panels." *Id.* Meijer's TAP contains many of the rules acclaimed by *Gilmer* for their ability to guard against potential arbitral bias, but unlike the rules considered in *Gilmer*, Meijer's TAP grants one party to the arbitration unilateral control over the pool of potential arbitrators. This procedure prevents Meijer's TAP from being an effective substitute for a judicial forum because it inherently lacks neutrality.[7]

Our conclusion that Meijer's TAP is not an effective substitute for a judicial forum dictates that McMullen's Title VII claims are not subject to the TAP arbitrator-selection provision. The question remains whether Meijer's TAP is thus unenforceable in its entirety or whether the selection procedure can be severed and replaced with an appropriate equitable process.

---

[7]Meijer also argues that *Gilmer* clearly establishes that the preferred method of challenging allegations of bias is to pursue the underlying claims through the arbitration process and then seek review only "[w]here there was evident partiality or corruption in the arbitrators." *Gilmer*, 500 U.S. at 30 (quoting 9 U.S.C. § 10(b)). While this is true for allegations of potential or hypothetical bias among the arbitrators, it does not apply to an allegation, as is present here, that the arbitrator-selection process is fundamentally unfair. The *Hooters* court and the *Floss* court both recognized that procedural unfairness inherent in an arbitration agreement may be challenged before the arbitration. When the process used to select the arbitrator is fundamentally unfair, as in this case, the arbitral forum is not an effective substitute for a judicial forum, and there is no need to present separate evidence of bias or corruption in the particular arbitrator selected.

The parties' appellate briefs do not address the issue of whether invalidation of the arbitrator-selection provision renders the TAP unenforceable in its entirety. Meijer raised the issue in a petition for rehearing filed after this court's original opinion declared the entire agreement unenforceable, and McMullen has responded to the petition. Meijer concedes that the TAP lacks a severability clause. It argues, however, that the parties' intent governs the issue of severability and urges us to find that the TAP's incorporation of the Employment Dispute Rules of the AAA evidences an intent to have an arbitrator selected in accord with the AAA's rule providing for selection of an arbitrator from its list when the parties' agreement does not include an arbitrator-selection method. Alternatively, it urges us to direct the district court to appoint an arbitrator in accord with the Federal Arbitration Act (FAA) procedure specified in 9 U.S.C. § 5. Finally, Meijer relies on *Chattanooga Mailers' Union, No. 92 v. Chattanooga News-Free Press Co.*, 524 F.2d 1305 (6th Cir. 1975) (abrogation on other grounds recognized by *Bacashihua v. United States Postal Serv.*, 859 F.2d 402, 404 (6th Cir. 1988)), in which this court enforced an arbitration provision included in a collective bargaining agreement, despite the agreement's inclusion of an allegedly illegal closed-shop provision and the absence of a severability clause, and determined that utilization of the arbitrator-selection procedure of § 5 was appropriate, given the fact that the procedure specified in the parties' agreement was unworkable at the time.

McMullen responds that the TAP's specific exclusion of AAA administration of any arbitration under the TAP negates any inference that the parties intended application of AAA's arbitrator selection rule. She also asserts that *Chattanooga Mailers' Union* is factually dissimilar to this case. She cites *NLRB v. Rockaway News Supply Co.*, 375 U.S. 71 (1953), and Michigan case law, which in her view set forth a rule that, even when a severability clause is present, the agreement is unenforceable in its entirety when the invalidated provision is central to the agreement or "so interwoven with all of its

terms that it must stand or fall as an entirety." *Id*. at 78. The arbitrator-selection provision is so central, in her view, that its invalidation requires invalidation of the entire agreement.

In determining whether the TAP should be enforced absent the invalid arbitrator-selection mechanism and, if it should, how to select an arbitrator, the parties' intent is a primary issue. *See generally Morrison*, 317 F.3d at 676-77 (interpreting arbitration contract provision as manifesting parties' intent to sever invalid terms when construction unclear under state law, given Supreme Court precedent requiring resolution of doubt in favor of arbitration); *Great Earth Cos. v. Simons*, 288 F.3d 878, 890-91 (6th Cir. 2002) (finding clause requiring arbitration in New York severable from remainder of arbitration agreement based on parties' intent); *Chattanooga Mailers' Union*, 524 F.2d at 1315 (requiring arbitration consistent with parties' intent although arbitration procedure they selected was unworkable); *Brucker v. McKinlay Transp., Inc.*, 557 N.W.2d 536, 541 (Mich. 1997) (refusing to invalidate entire arbitration agreement containing invalid provision when parties stipulated to arbitration rules); *Samuel D. Begola Servs., Inc. v. Wild Bros.*, 534 N.W.2d 217, 220 (Mich. Ct. App. 1995) (noting that in determining severability "the primary consideration is the intention of the parties" and finding attorney fee provision severable from rescinded purchase agreements). Yet, in this context, intent is not the only consideration. Federal policy favoring arbitration may figure into the analysis, *see Morrison*, 317 F.3d at 675, 679-80, as may the interplay between state law and that federal policy, *see id*. In addition, as *Morrison* indicates, reliance on *Chattanooga Mailers' Union* is still appropriate in cases concerning the severability of arbitration contract provisions. 317 F.3d at 678 n.22.

Here, the parties did not raise any factual issues involving their intent before the district court and, indeed, did not address the legal issues surrounding severability at any time until Meijer's petition for rehearing was filed. Under these circumstances, we find it appropriate to remand to the district court so that it can determine in the first instance, after full briefing and development of any necessary additional record, whether the TAP can be enforced without the impermissible arbitrator-selection provision. If the district court decides that the remainder of the agreement can be enforced, it will also have to determine how an arbitrator should be selected.

## III.

For all of these reasons, we reverse the district court's grant of summary judgment to Meijer and the district court's denial of summary judgment to McMullen. We remand the case to the district court for further proceedings consistent with this opinion.