**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 18a0109n.06

**No. 17-1501**

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Mar 02, 2018
DEBORAH S. HUNT, Clerk

KEVEN SMITH, et al.,

     Plaintiffs-Appellees,

v.

ALTISOURCE SOLUTIONS, et al.,

     Defendants-Appellants.

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN

BEFORE:    BOGGS, CLAY, and KETHLEDGE, Circuit Judges.

**CLAY, Circuit Judge.** This case arises from a dispute over the scope of a mandatory arbitration provision in a Purchase and Sale Agreement. Defendants Altisource Solutions, Inc., et al., appeal the district court's order denying in part their motion to compel arbitration. Because we find that neither the Tax Set-off Dispute nor Counts IV–V of Plaintiff's complaint fell within the scope of the parties' arbitration agreement, we **AFFIRM** the decision of the district court.

## BACKGROUND

### A.    Factual Background

Plaintiff Keven Smith ("Smith") was the owner, President, and CEO of Mortgage Builder Software, Inc. ("MBSI"), a developer and licensor of mortgage-origination software. On July 18, 2014, Smith entered into a Purchase and Sale Agreement (the "PSA") with Defendants Altisource Solutions S.À.R.L. and Altisource Solutions, Inc. (collectively, "Altisource"),

pursuant to which Altisource acquired substantially all of the assets of MBSI (the "Acquired Business"). Smith formed a separate entity called Biscayne & Associates, Inc. ("Biscayne"), which is the "Seller" under the PSA and a plaintiff herein. The PSA required Altisource to pay Biscayne a base purchase price of approximately $15 million at closing, plus contingent "Earn-out Payments" of up to a total of $7 million if Adjusted Revenue reached certain thresholds in each of the three years following the Closing Date.

At the same time, the parties also entered into a second agreement (the "Employment Agreement"), whereby Altisource retained Smith as an employee tasked with performing certain services to support the Acquired Business. Within a year after the Closing Date, the parties terminated the Employment Agreement, and Smith became a consultant to Altisource under a separate "Transition and Consulting Agreement," with his authority significantly reduced.

On March 19, 2015, the parties entered into a First Amendment to the Agreement, pursuant to which Altisource was to remit certain "Aged Receivables" to Biscayne. Plaintiffs claim that Altisource never paid Biscayne any Aged Receivables, which forms the basis for Count IV of the Complaint.

1. The Earn-Out Provisions

Under the PSA, Biscayne is potentially eligible to receive "Earn-out Payments" during each of three Measurement Periods if the Adjusted Revenue of the Acquired Business exceeds certain levels and certain other conditions are satisfied. Section 2.5 governs when Earn-out Payments are due and how they are to be calculated. In relevant part, that Section provides:

> (a) [Biscayne] may be entitled to receive additional contingent payments (collectively, the "Earn-out Payments") in the manner described in this Section 2.5. The Earn-out Payments *shall be calculated as follows*:
>> (i) As further described in this Section 2.5, following the end of each Measurement Period, [Altisource] shall calculate the Adjusted Revenue during such

Measurement Period. With respect to those Measurement Periods set forth on Annex II, in the event that the Adjusted Revenue equals an amount set forth in the left-hand column of the chart attached hereto as Annex II, then [Biscayne] shall be entitled to an aggregate Earn-out Payment equal to the amount set forth in the corresponding row in the right-hand column of the chart . . . . The Parties acknowledge and agree that under no circumstance shall the aggregate amount of the Earn-out Payments paid or payable hereunder exceed Seven Million Dollars ($7,000,000).

(ii)     During each Measurement Period, to the extent [Smith] is employed or engaged by [Altisource] to perform services, (A) [Smith] shall ensure his services are performed in good faith and in the best interest of [Altisource], including operating the Acquired Business within the guidelines of an annual budget approved by [Altisource] . . . .

(iii)    Notwithstanding anything to the contrary herein, (A) if a Forfeiting Condition[1] occurs prior to or during the First Period, then [Biscayne] shall not be entitled to receive any Earn-out Payments with respect to the Second Period or the Third Period . . . .

(R. 1-2, PSA, PageID# 33–34 (emphasis added).)

Sections 2.5(c)–(f) of the PSA then set forth a detailed process for (1) communicating about any Earn-out Payment due at the end of a Measurement Period and (2) resolving certain disputes between the parties related to an Earn-out Payment. Specifically, Section 2.5(c) requires Altisource to conduct a financial review of the business and prepare a statement of the Adjusted Revenue during such Measurement Period. If an Earn-out Payment is due, Altisource is then required to submit to Biscayne an Earn-out Statement, together with copies of such computations and all reasonable supporting documentation.

Section 2.5(d) originally provided that the Earn-out Statement would become final and binding upon the Parties on the first day following written notice from Biscayne that the Earn-

---

[1] A "Forfeiting Condition" occurs if Smith resigns or is terminated "for Cause (as such term is defined in [Smith's] Employment Agreement)." (R. 1-2, Agreement Annex at § 58, PageID # 85.)

out Statement was agreed to, or in the absence of such notice, on the thirty-first day following delivery of the Earn-out Statement, unless Biscayne gave written notice of its disagreement with the Earn-out Statement (a "Notice of Disagreement with Earn-out Statement"). On January 12, 2016, the parties amended this provision to provide that the "Earn-out Statement" does not become final and binding until the first day after written acceptance by Biscayne or, alternatively, the thirty-first day after written notice by either party that discussions to resolve any disagreements about the computation are terminated.

And finally, Section 2.5(f) provides that if Biscayne delivers a Notice of Disagreement with Earn-out Statement, the parties must spend the next thirty days seeking to resolve in writing the issues identified in the notice. If, however, the parties cannot resolve those disputes, they must "submit to the Arbitrator for review and resolution any and all matters which remain in dispute and which were included in any Notice of Disagreement with Earn-out Statement." (R. 1-2, PSA, PageID # 35.) The Agreement defines the "Arbitrator" as "the Boston, Massachusetts office of Ernst & Young LLP." (*Id*. at PageID # 34.)

### 2. The Earn-Out Dispute

On December 15, 2015, Altisource delivered to Biscayne an Earn-out Statement for the First Measurement Period. According to the Earn-out Statement, Altisource had an Adjusted Revenue of $11,844,395. Under Annex II of the Agreement, that level of Adjusted Revenue would entitle Biscayne to an Earn-out Payment of $933,000.

Nonetheless, Altisource declined to make that payment. In a separate letter accompanying the Earn-out Statement, Altisource contended that it was not required to make the first Earn-out Payment because Smith failed to meet the conditions set forth in Subsection 2.5(a)(ii) that required him to "operat[e] the Acquired Business within the guidelines of an

annual budget approved by Purchasers and their Affiliates" (R. 11-7, Earn-out Statement Cover Letter, PageID # 605.)—this notwithstanding that Smith's demotion to consultant under the "Transition and Consulting Agreement" stripped him of all power to operate the business in conformity with the annual budget. The district court called this the "Budget Compliance Dispute." (R. 20, Order, PageID # 680.) Altisource further stated that "[e]ven if [Biscayne] were entitled to an Earn-out Payment for the First Measurement Period, [Altisource] would be entitled to [a] set-off [pursuant to § 8.4] [of] . . . any damages [Biscayne] owe[d] [Altisource]" related to Plaintiffs' breach of the representations and warranties set forth in Section 3.5(a) of the Agreement. (R. 11-7, Earn-out Statement Cover Letter, PageID # 605.) The district court called this the "Tax Set-off Dispute." (R. 20, Order, PageID # 680.) The accompanying letter referenced an earlier letter from August 7, 2015, in which Altisource asserted that Plaintiffs had breached Paragraphs 2.1(e) and 3.5(a) of the PSA because there were errors in informational returns that Biscayne filed with the IRS on behalf of its customers and therefore that it was entitled under § 8.4 to set-off any damages it sustained.[2]

One week after receiving the Earn-out Statement, on December 22, 2015, Plaintiffs responded in a letter to Altisource disputing its assertion that no Earn-out Payment was owed. Plaintiffs argued that Smith did not have "operational control" of the Acquired Business after the sale, and therefore that he had no ability to ensure that the Acquired Business was operated within an "annual budget." Further, Plaintiffs "object[ed] to [all] claims made for which [Altisource is] claiming a setoff." (R. 7-2, December 22 Letter to Altisource, PageID # 508–09.) Plaintiffs concluded their letter by warning that if Altisource did not revise its position and make the Earn-out Payment, Plaintiffs would "be required to issue a Notice of Disagreement with

---

[2] According to Biscayne, it corrected the errors within two days of receiving notice from the IRS. And Altisource acknowledges that most of these issues have been resolved.

Earn-Out Statement" under the Agreement's dispute resolution provisions. (*Id.*) In sum, the parties' dispute boiled down to two main issues: (1) whether Smith violated any obligation to operate the Acquired Business within a budget, pursuant to Section 2.5(a)(ii), and (2) whether Plaintiffs' alleged violation of Section 3.5(a) entitled Altisource to withhold any Earn-out Payments due to Biscayne based on the set-off provision in Section 8.4.

As referenced above, Section 2.5(d) of the Agreement was amended on January 12, 2016 during discussions to resolve the parties' dispute. Pursuant to the January 2016 Amendment, the Earn-out Statement becomes final on the first day after notice from Biscayne that Biscayne agrees with the Earn-out Statement or, alternatively, on the thirty-first day after delivery of notice from either party that discussions to resolve any disputes are terminated by way of a "Notice of Disagreement Deadline," unless Biscayne delivers a "Notice of Disagreement" before such time. The record does not show that Biscayne ever submitted a formal Notice of Disagreement.

## B. Procedural History

On April 26, 2016, Plaintiffs filed suit against Altisource in federal district court. Plaintiffs filed an Amended Complaint on August 15, 2016, asserting five counts against Altisource. Three of those counts—namely, Counts I–III—relate to whether Altisource owes the Earn-out Payment for the First Measurement Period; the remaining counts relate to other matters. Count I seeks a declaratory judgment regarding Altisource's obligation to make the earn-out Payment for the First Period. Similarly, Count II alleges anticipatory repudiation of the Agreement based on Altisource's position set forth in the Earn-out Statement. Count III seeks a declaratory judgment related to Altisource's set-off claim under Sections 3.5(a) and 8.4 of the Agreement (*i.e.*, the Tax Set-off Dispute). Count IV relates to allegedly unpaid receivables

under the March 19, 2015 First Amendment to PSA (the "March 19 Amendment"). And Count V relates to allegedly unpaid consulting fees under the Transition and Consulting Agreement totaling approximately $18,000.

On October 5, 2016, Defendant moved in the district court to compel arbitration and stay the proceeding. Defendant argued that the arbitration clause governed Plaintiffs' Counts I–III because those counts "specifically concern whether Biscayne is entitled to an Earn-out Payment" and "[t]he arbitration clause governs disputes regarding not only the amount of the Earn-out Payment, but also whether Biscayne is entitled to an Earn-out Payment *at all*." (R. 7, PageID # 496 (emphasis in original).) Altisource also argued that the arbitration clause governed Plaintiffs' Counts IV and V because they were "closely connected" to the calculation of the Earn-out Payment. (*Id.* at PageID # 503.)

On April 18, 2017, the district court granted in part and denied in part Defendant's motion to compel arbitration. The court granted the motion to compel arbitration for the portions of Counts I and II that rested upon the "Budget Compliance Dispute" because "it cannot say 'with positive assurance' that the dispute falls outside of the Agreement's arbitration provision." (R. 20, Order, PageID # 684 (quoting *Teamsters*, 748 F.3d at 288).) The court reasoned that Section 2.5(a) of the Agreement begins by stating that the "Earn-out Payments shall be *calculated* as follows," and that "one of the immediately following sub-sections, 2.5(a)(ii), refers to Smith's obligation to, among other things, operate the Acquired Business in compliance with an annual budget approved by Altisource." (*Id.* at PageID # 686.) Thus, the court concluded that the "listing of Smith's budget compliance obligations under the section concerning the 'calculation' of the Earn-out Payments creates an ambiguity as to whether the required 'calculation' includes an assessment of Smith's fulfillment of his budget compliance obligation"

and "[t]hat ambiguity requires the Court to compel arbitration of the Budget Compliance Dispute." (*Id.*)

The court cautioned, however, that the Agreement was only "ambiguous with respect to whether the parties must arbitrate the Budget Compliance Dispute . . . . " (*Id.* at PageID # 688–89.) It declined to compel arbitration of the "Tax Set-off Dispute" because it found that the arbitration provision applied only to disputes related to the "calculation" of the Earn-out Payments, and the Tax Set-off Dispute was based on a different provision of the Agreement (namely, § 8.4) and hence could not "even arguably relate to th[e] 'calculation.'" (*Id.* at PageID # 689.) As it reasoned:

> [T]he premise of the Tax Set-off Dispute is that – wholly apart from the 'calculation' of the Earn-out Payment – Altisource need not make the Earn-out Payment because Plaintiffs' debt to Altisource exceeds the Earn-out Payment. Because the tax set-off claimed by Altisource and the 'calculation' of the Earn-out Payments are entirely independent of one another, the Tax Set-off Dispute is not subject to arbitration.

(*Id.* at PageID # 689–90.) Similarly, the court declined to compel arbitration of Counts IV and V because neither "even arguably relates to the 'calculation' of the Earn-out Payments (as that term is used in the Agreement), and thus neither is subject to arbitration." (*Id.* at PageID # 690.)

The court stayed Plaintiffs' claims that it was compelling the parties to arbitrate the Budget Compliance parts of Counts I and II, but, relying on its "discretion to control its docket", *Moses H. Cone Mem'l Hosp. v. Mercury Costr. Corp.*, 460 U.S. 1, 20 n.23 (1983), it did not stay the remaining claims that it determined were not subject to arbitration. (*Id.* at PageID # 690–91.)

Altisource timely filed a Notice of Appeal on May 2, 2017, challenging the district court's denial of its motion to compel arbitration.

## DISCUSSION

### Standard of Review

A district court's decision whether to compel arbitration under the Federal Arbitration Act (FAA) 9 U.S.C. § 1 *et seq.,* is reviewed *de novo*. *Hurley v. Deutsche Bank Trust Co. Americas*, 610 F.3d 334, 338 (6th Cir. 2010). "Similarly, the district court's decisions regarding the arbitrability of a particular dispute are reviewed *de novo*." *Nestle Waters N.A., Inc. v. Bollman*, 505 F.3d 498, 502 (6th Cir. 2007) (citing *McMullen v. Meijer, Inc.*, 355 F.3d 485, 489 (6th Cir. 2004)).

### Analysis

"Before compelling an unwilling party to arbitrate, [a] court must engage in a limited review to determine whether the dispute is arbitrable; meaning that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of that agreement." *Bratt Enters., Inc. v. Noble Int'l Ltd.*, 338 F.3d 609, 612 (6th Cir. 2003) (quoting *Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 624 (6th Cir. 2003)). We hold that the district court properly concluded that the arbitration provision found in Section 2.5 of the PSA did not apply to the Tax Set-off Dispute or to the disputes in Count IV and V of Plaintiffs' complaint.

The Federal Arbitration Act (the "FAA") reflects "both a liberal federal policy favoring arbitration and the fundamental principle that arbitration is a matter of contract." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (internal quotation marks and citations omitted). Under the FAA, a written agreement to arbitrate disputes "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. But courts must not forget that "[a]rbitration under the [FAA] is a matter of consent, not coercion." *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior*

*Univ.*, 489 U.S. 468, 479 (1989). Thus, "[w]hile ambiguities in the language of the agreement should be resolved in favor of arbitration, [the Court] [will] not override the clear intent of the parties, or reach a result inconsistent with the plain text of the contract, simply because the policy favoring arbitration is implicated." *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002); *see Bratt*, 338 F.3d at 612 ("The duty to arbitrate a dispute derives from the parties' agreement and a party cannot be required to submit to arbitration any dispute that the party has not agreed to so submit."); *see also Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 302 (2010) ("[W]e have never held that [the federal policy favoring arbitration] overrides the principle that a court may submit to arbitration 'only those disputes . . . that the parties have agreed to submit.'") (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995)). In short, the federal presumption in favor of arbitration cannot be used as a means of rewriting the arbitration clause to encompass a dispute that the parties did not intend for arbitration and that the contract does not anticipate. *See Shy v. Navistar Int'l Corp.*, 781 F.3d 820, 833 (6th Cir. 2015) (Clay, J., dissenting).

Accordingly, "[w]hen asked by a party to compel arbitration under a contract, a federal court must determine whether the parties agreed to arbitrate the dispute at issue." *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000) (citing *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 626 (1985). And "[w]hen deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *First Options*, 514 U.S. at 944.

Section 9.13 of the PSA specifies Delaware law as the law applicable to any dispute between the parties. And Delaware law repeats the principle that "[a]rbitration is a creature of contract and contract language controls above all else." *Medicis Pharm. Corp. v. Anacor*

*Pharm., Inc.*, No. 8095, 2013 WL 4509652, at *9 (Del. Ch. Aug. 12, 2013).  Thus, "[a] party cannot be forced to arbitrate the merits of a dispute . . . in the absence of a clear expression of such intent in a valid agreement."  *James & Jackson, LLC v. Willie Gary, LLC*, 906 A.2d 76, 79 (Del. 2006).  Moreover, "a party attempting to invoke arbitration will not prevail by reciting the message that courts favor arbitration when the contract language they rely on does not demonstrate the parties' intent to submit the dispute in question to arbitration."  *Medicis Pharm. Corp.*, 2013 WL 4509652 at *9; *see also Parfi Holding AB v. Mirror Image Internet, Inc.*, 817 A.2d 149, 156 (Del. 2002) ("The policy that favors alternate dispute resolution mechanisms . . . does not trump basic principles of contract interpretation.").

> In this case, the parties' agreement to arbitrate reads, in pertinent part:
>
> (f)      During the thirty (30) days immediately following the delivery of any Notice of Disagreement with Earn-out Statement, each Purchaser and Seller shall seek in good faith to resolve in writing any differences which they may have with respect to the matters specified in such Notice of Disagreement with Earn-out Statement.  If such differences have not been resolved by the end of such thirty (30)-day period, each Purchaser and Seller shall submit to the Arbitrator for review and resolution any and all matters which remain in dispute and which were included in any Notice of Disagreement with Earn-out Statement, and the Arbitrator shall reach a final, binding resolution of all matters which remain in dispute within sixty (60) days after such dispute is referred to the Arbitrator.

(R. 1-2, PSA, PageID # 35.)  The plain language of this section demonstrates that the parties agreed to submit to the Arbitrator any disagreements that were included in a Notice of Disagreement with Earn-out Statement.  The district court interpreted this language to mean any disagreements that were "*properly* included" in the notice of disagreement.  (R. 31, Hearing Trans., PageID # 799.)  And Defendant conceded that such a limitation was appropriate.  (R. 31, Hearing Trans., PageID # 799 ("THE COURT: I assume – when I read that, it seems to me that it not just was included in the notice of disagreement but that it was properly included within the notice of disagreement.  Do you agree with that?  [DEFENSE COUNSEL]: Yes, I do, Your

Honor.").) That the parties happened to include a dispute in the Notice of Disagreement is not enough.[3]

Based on this language, the district court ordered the parties to arbitrate only the disputes relating to the "calculation" of the Earn-out statement because that was the precise subject of Section 2.5 and the expressed scope of Section 2.5(f)'s arbitration provision. This included the dispute over Smith's alleged noncompliance with the annual budget because Subsection 2.5(a)(ii) was among the provisions specified in Section 2.5(a)'s "calculation" of the Earn-out Payment. The Tax Set-off Dispute, however, did not arise from § 2.5 and hence did not relate to the "calculation" of the Earn-out payment. Similarly, Count IV relates to an entirely separate provision and Count V derives from a separate agreement; thus, these claims also could not fall under the ambit of § 2.5's "calculation."

Here on appeal, Defendant again argues that the district court should have compelled arbitration of the Tax Set-off Dispute because the arbitration clause requires the parties to arbitrate "any and all matters which *remain in dispute* and which were included in any Notice of Disagreement with Earn-out Statement" and the Tax Set-off claim undeniably remains in dispute. (Brief for Appellant at 9, 14.) As explained above, the district court declined to read the arbitration provision so broadly and instead read it to require the arbitration only of disputes that were (or could have been) "properly included within the notice of disagreement." (R. 31, Hearing Trans., PageID # 799.) Similarly, the district court refused to adopt Defendant's broad interpretation of the provision that would require arbitration of anything "affecting" the

---

[3] Further, even if it were enough merely to include a dispute in the Notice of Disagreement with Earn-out Statement, it does not appear that any such Notice of Disagreement was ever filed between the parties. And moreover, the Tax Set-off Dispute, while mentioned in the Cover Letter to the Earn-out Statement, does not appear in the Earn-out Statement, itself. Thus, even if Plaintiffs had filed a Notice of Disagreement, it is unlikely that they would have included their objection to Defendant's tax set-off claim: the Tax Set-off Dispute may be a source of disagreement between the parties, but it would not be a source of disagreement *with the Earn-out Statement* as such. In short, even under Defendant's proposed reading of the arbitration provision, it would not make sense to require arbitration of the Tax Set-off Dispute.

availability or the amount of the Earn-out Payment.  Indeed, the district court recognized that "[a]ny sort of claim that [Altisource] could have against the seller could potentially result in a set-off.  And so this seems to me to make the arbitration provision virtually unlimited[.]" (*Id.* at PageID # 806.)

The district court's interpretation of the scope of the arbitration provision entirely comports with this Court's case law.  This Court has held that a district court should decline to compel arbitration of a dispute if "it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Teamsters Local Union 480 v. United Parcel Serv., Inc.*, 748 F.3d 281, 288 (6th Cir. 2014) (quoting *AT&T Techs., Inc. v. Commc'n Workers of America*, 475 U.S. 643, 650 (1986)).  And a plain reading of the PSA shows that the parties agreed to arbitrate only disputes over the *calculation* of the Earn-out Payments; they did not agree to arbitrate *all* disputes between the parties that might somehow affect Biscayne's entitlement to Earn-out Payments.  Thus, Altisource's repeated invocation of the FAA's presumption in favor of arbitration is unavailing because that presumption applies only where the arbitration provision could "fairly be read to cover" the particular dispute.  *Shy*, 781 F.3d at 827.  And the arbitration provision found in Section 2.5(f) cannot fairly be read to cover disputes deriving from Sections 3.5(a) and 8.4 (the Tax Set-off Dispute); from the First Amendment to the Agreement, which was not related to Section 2.5 and instead concerned the remittance of "Aged Receivables" (Count IV); or from the entirely separate Transition and Consulting Agreement signed between Altisource and Plaintiff Smith (Count V).  This is true whether or not these ancillary disputes may have an incidental impact on how the proceeds from the § 2.5(f) dispute are ultimately allocated.  The case law cited by Defendant does not compel an alternative conclusion.

Defendant relies on *PureWorks* and *Shy* to argue that the Tax Set-off Dispute and Counts IV–V should be arbitrated simply because these disputes affect either the availability of an Earn-out Payment or its amount. The arbitration provisions in those cases, however, were very different from the one in this case. In *PureWorks*, the agreement between the parties provided "*broadly* for arbitration of 'disputes *regarding* the [e]arn-out [r]eport.'" *PureWorks, Inc. v. Unique Software Sols., Inc.*, 554 F. App'x 376, 378 (6th Cir. 2014) (emphasis added) (alteration in original). That provision was considerably broader than the one in this case, which refers to arbitration only those unsettled issues that relate to the calculation of the Earn-out Payment and which were ("properly," *see supra*) included in a Notice of Disagreement.

Similarly, *Shy* also involved a much broader arbitration provision. *Shy v. Navistar Int'l Corp.*, 781 F.3d 820 (6th Cir. 2015). In *Shy*, the defendant had an obligation to make yearly profit-sharing payments to a Supplemental Benefit Trust in accordance with a Profit Sharing Plan (the "Plan"). *Id.* at 822. The plaintiffs alleged that the defendant was "improperly classifying various aspects of its business activities and structuring its business so as to evade its profit-sharing obligations under the agreement." *Id.* The Plan included a dispute resolution clause that required that disputes over the "information or calculation[s]" of the profit-sharing payments be referred to binding arbitration. *Id.* at 823. The court held that "[d]isputes over how earnings, hours worked, and similar aspects of a business should be categorized for the purposes of an accounting analysis are disputes over 'information'" and the arbitration provision "[wa]s not limited by its terms to disputes over the calculations involved." *Id.* at 825. Thus, "[t]o the extent that [the disputes concern] operational issues rather than classification issues, they are still so closely connected to the information [the defendant] provides to the [Supplemental Benefit Committee] that they count as disputes over that information." *Id.* at 826. Therefore, the Court's

holding that the disputes were properly reserved for arbitration was explicitly based on the broad arbitration provision that included disputes over any "information" included in the calculation of the payments.

Defendant repeatedly claims that federal law requires courts to read the arbitration provision "as broadly as possible," (*See, e.g.*, Brief for Appellant at 9), but that is not the law. The FAA requires a court to interpret an arbitration provision to apply wherever it is ambiguous whether the parties agreed to arbitrate a particular dispute—that is, the court is not to interpret it as broadly as *possible* but only as broadly as it remains consistent with the terms of the contract and the intention of the parties. In this case, the district court correctly held that the arbitration provision of Section 2.5(f) applied to all challenges to the "calculation" of the Earn-out Payment. Neither the Tax Set-off Dispute nor Counts IV–V of Plaintiff's complaint challenge the calculation and thus those claims are not subject to arbitration.

## CONCLUSION

For the reasons set forth above, we **AFFIRM** the district court's decision denying in part Defendant's motion to compel arbitration.