OPINION AND ORDER
 

 SARGUS, District Judge.
 

 This matter is before the Court for consideration of Defendants’ Motion to Dismiss or, in the alternative, to Stay litigation pending arbitration. (Doc. # 38). For the reasons that follow, the motion is granted.
 

 I.
 

 Plaintiff, Peter B. Scovill, [“Plaintiff’] filed this action in the Court of Common Pleas for Franklin County, Ohio claiming that he was discriminated against by his employer, Defendant WSYX / ABC Television, on account of his age, in violation of the Age Discrimination in Employment Act [“ADEA”], 29 U.S.C. § 621,
 
 et seq.,
 
 and Ohio law, R.C. § 4112.02. Plaintiff also brings claims for unlawful retaliation under R.C. § 4112.02, invasion of privacy, promissory estoppel, and violation of Ohio public policy. The Defendants are: the Sinclair Broadcast Group, Inc., Sinclair Communications, Inc., Sinclair Media II, Inc., WTTE/WSYX-TV, Columbus (WTTE-TV), Inc., WTTE, Channel 28, Inc., and David Silverstein (“Defendants”). The Defendants removed the case to this Court under 28 U.S.C. §§ 1441 and 1446(b). The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 based upon the ADEA claim. The Court has supplemental jurisdiction over Plaintiffs state law claims pursuant to 28 U.S.C. § 1367.
 

 Plaintiff was hired and employed by Defendant Sinclair Media II, Inc. [hereinafter “Sinclair”] as an anchor/reporter for WSYX/WTTE-TV (Fox TV or Fox 28) from September 11, 1998 until May 17, 2002.
 
 (Am. Complaint
 
 at ¶ 2 and 12). Sinclair sent an initial two-page letter dated July 31, 1998 to confirm the parties’ agreement of a three-year written contract that established regular pay raises and bonuses.
 
 (Am. Complaint
 
 at ¶ 12;
 
 Defendants’ Reply Memorandum in Support of Motion to Dismiss
 
 at 2). At the time of the Defendants’ offer, Plaintiff was employed as an anchor with WFTX-TV in Cape Coral, Florida, where he had worked for eleven years.
 
 (Am. Complaint
 
 at ¶ 13). Throughout his discussions regarding employment with the Defendants, according to the Amended Complaint, Plaintiff was repeatedly told that his contract would be renewed at the end of the three-year period if his program ratings had grown and bonuses under the agreement were paid.
 
 (Am. Complaint
 
 at ¶ 14). Plaintiff signed his initial employment letter on August 3, 1998 and began working on September 11, 1998.
 
 (Defendants’ Reply Memorandum in Support of Motion to Dismiss
 
 at 3).
 

 Sometime thereafter, Plaintiff signed an Employment Agreement (“the Agreement”) dated September 30, 1998, which provides in relevant part k
 

 15.
 
 ARBITRATION.
 
 Except as specifically provided in Section 12,
 
 [1]
 
 Employee and Employer agree to submit any dispute or controversy arising out of or relating to this Agreement, including, but not limited to, claims of termination allegedly resulting from discrimination on the basis of race, sex, age, national origin, ancestry, color, religion, marital status, status as a veteran of the Vietnam era, physical or mental disability, medical condition, claims based on common law, contract, or statutorily created or protected rights or any other basis prohibited by law, exclusively to final
 
 *MI
 
 and binding arbitration before a neutral arbitrator.
 

 If Employee and Employer are unable to agree upon a neutral arbitrator, Employer will obtain a list of arbitrators from a state or federal arbitration service. Employee (first) then Employer will alternately strike names from the list until only one name remains; the remaining person shall be the arbitrator. The arbitrator shall be bound by the qualifications and disclosure provisions and the procedures set forth in the 1989 Model Employment Arbitration Procedures of the American Arbitration Association and shall order such discovery as is appropriate to the nature of the claim and necessary to the adjudication thereof.
 

 Arbitration proceedings shall be held in the city or town where Employee’s employment services were performed.... The arbitrator shall determine the prevailing party in the arbitration and the costs of the arbitration shall be paid by the non-prevailing party.
 

 Employee and Employer agree that this arbitration shall be the exclusive means of resolving any dispute or controversy arising out of or relating to this Agreement, Employee’s employment with Employer, or termination of Employee’s employment, and that no other action will be brought by Employee in any court or other forum, including but not limited to, claims based on common law, contract or statutorily created or protected rights. THIS AGREEMENT IS A WAIVER OF ALL RIGHTS TO A CIVIL COURT ACTION FOR A DISPUTED TERMINATION; ONLY THE ARBITRATOR, NOT A JUDGE OR JURY, WILL DECIDE SUCH A DISPUTE.
 

 Employee and Employer agree that if any court of competent jurisdiction declares that any pat of this arbitration provision is illegal, invalid or unenforceable, such a declaration will not affect the legality, validity or enforceability of the remaining parts of the arbitration provision and the illegal, invalid or unenforceable part will no longer be part of this arbitration provision.
 

 (Exhibit A attached to
 
 Defendants’ Motion to Dismiss or Stay).
 

 During the time that Plaintiff co-anchored the Fox TV 10:00 p.m. news program, Plaintiff contends that the program’s ratings rose consistently.
 
 (Am. Complaint
 
 at ¶ 17). Besides providing services to Defendants as an anchor, Mr. Scovill also functioned as an investigative reporter and, at the station’s request, engaged in numerous community services and public affairs activities.
 
 (Am. Complaint
 
 at ¶ 18). At Defendants’ encouragement and request, Plaintiff appeared on and worked with numerous radio stations in the central Ohio area.
 
 (Am. Complaint
 
 at ¶ 20).
 

 According to Plaintiff, during his employment with Sinclair, Defendants’ manager told Plaintiff that his contract would be renewed based on his performance and the show’s ratings, and that he could expect a substantial increase in salary at the time of his contract renewal.
 
 (Am. Complaint
 
 at ¶ 21). Relying on the manager’s promise, Plaintiff refrained from looking for other employment and declined to pursue other employment opportunities.
 
 (Am. Complaint
 
 at ¶ 22). In the spring of 2001, Plaintiff applied for the position of News Director for WSYX/WTTE-TV.
 
 (Am. Complaint
 
 at ¶ 23). In July of 2001, Defendant David Silverstein was hired for the news director position instead.
 
 (Am. Complaint
 
 at ¶24). Plaintiff alleges that age was a determining factor in the decision to hire Silverstein rather than Plaintiff for the news director position.
 
 (Am. Complaint
 
 at ¶ 25)
 

 
 *MII
 
 On or about August 22, 2001, Silverstein informed Plaintiff that his contract would not be renewed.
 
 (Am. Complaint
 
 at ¶27a). Plaintiff alleges that Silverstein instructed the older anchors to refrain from mentioning their names on the air and discontinued promotions featuring the older anchors.
 
 (Am. Complaint
 
 at ¶ 27c). On or about January 7, 2002, Silverstein demoted Mr. Scovill from his position as Fox News Anchor.
 
 (Am. Complaint
 
 at ¶ 27d). In addition, Silverstein allegedly told Plaintiff that he had decided to promote the younger “more energetic” reporters to key anchor positions because they would relate better to the station’s target audience.
 
 (Am. Complaint
 
 at ¶ 27d). On or about February 6, 2002, Silverstein gave Plaintiff a written reprimand.
 
 (Am. Complaint
 
 at ¶ 27e). Following the reprimand, Plaintiff alleges that he suffered a physical and emotional reaction due to continued tensions at his work environment.
 
 (Plaintiff’s Memorandum Contra Defendants’ Motion to Dismiss
 
 at 11).
 

 In February 2002, Plaintiff took a medical leave of absence
 
 (Am. Complaint
 
 at ¶ 32). Following Plaintiffs request for leave, the Defendants allegedly instructed other station employees to engage in surveillance and monitoring of Plaintiffs personal activities away from work.
 
 (Am. Complaint
 
 at ¶ 32). In February 2002, the Defendants allegedly informed Mr. Sco-vill’s co-workers that he was not to be allowed on the station’s premises and that if he appeared on the premises they were to call the police.
 
 (Am. Complaint
 
 at ¶ 27g).
 

 Plaintiff alleges that he was falsely accused by the Defendants of violating obligations to the station and was notified that he would be disciplined upon his return to work following his medical leave of absence.
 
 (Am. Complaint
 
 at ¶ 34). On February 25, 2002, Plaintiff complained to the corporate Defendants of various allegedly unlawful discriminatory conduct and harassment to which he had been subjected.
 
 (Am. Complaint
 
 at ¶ 35). Eighty-one days after Mr. Scovill reported that he had been subjected to discrimination and harassment, the Defendants notified him that his employment was terminated.
 
 (Am. Complaint
 
 at ¶ 36).
 

 Plaintiff brings this action for age discrimination, invasion of privacy, promissory estoppel, and violation of public policy. Defendants have filed a Motion to Dismiss the above-mentioned claims or, in the alternative, to stay this action pending arbitration.
 

 II.
 

 Although Defendants have filed a Motion to Dismiss or Stay Pending Arbitration pursuant to Federal Rules of Civil Procedure 12(b)(1) alleging a lack of subject matter jurisdiction, Defendants’ motion does not come within the ambit of Rule 12(b) of the Federal Rules of Civil Procedure.
 
 Raasch v. NCR Corp.,
 
 254 F.Supp.2d 847, 851 (S.D.Ohio 2003). Instead, this case is governed by the Federal Arbitration Act (“FAA”), 9 U.S.C. § 1 (1947), which provides that “a party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement” may petition any federal district court, which would otherwise have jurisdiction over the underlying matter, “for an order directing that such arbitration proceed in the manner provided for in such agreement.” 9 U.S.C. § 4.
 

 With a policy favoring arbitration, the FAA was enacted by Congress “to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts.”
 
 See Gilmer v. Interstate/Johnson Lane Corp.,
 
 500 U.S. 20, 24,
 
 *MIII
 
 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991). In
 
 Circuit City Stores, Inc. v. Adams,
 
 532 U.S. 105, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001), the U.S. Supreme Court held that the FAA applies to employment contracts, and exempts only contracts involving transportation workers.
 

 In their Motion to Dismiss, Defendants argue that Plaintiff is required to submit his claims to arbitration according to the provisions found in his Employment Agreement, attached to
 
 Defendants’ Motion to Dismiss
 
 as Exhibit A. Plaintiff contends that he need not submit his claim to arbitration because the provision is allegedly unenforceable. Plaintiffs argument is based on the following: (1) there was no “meeting of the minds” in entering into the agreement; (2) the arbitration clause is proeedurally and substantively unconscionable; (3) the arbitration clause is voidable under the doctrine of duress, (4) the arbitration clause lacks mutuality; (5) the arbitration clause violates the Older Workers Benefit Protection Act (OWBPA); (6) ADEA claims are not subject to mandatory arbitration; and (7) the arbitration clause lacks consideration.
 

 The parties have fully briefed all issues relating to the question of whether the claims set forth in the Amended Complaint are covered by an agreement to arbitrate and whether such purported agreement to arbitrate is enforceable. Consequently, the Court will consider the motion as one seeking to compel arbitration under 9 U.S.C. § 4.
 

 III.
 

 Under section 2 of the FAA, an arbitration agreement is “valid, irrevoea-ble, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.” 9 U.S.C. § 2. The United States Supreme Court has held that agreements to arbitrate employment disputes are generally enforceable under the FAA.
 
 Circuit City Stores, Inc. v. Adams,
 
 532 U.S. 105, 109, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001). Furthermore, it is well-settled that employment discrimination claims under federal statutes can be subject to arbitration.
 
 Gilmer v. Interstate
 
 /
 
 Johnson Lane Corp.,
 
 500 U.S. 20, 26, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991)
 
 [2]
 
 . Arbitration of such claims is appropriate because in “agreeing to arbitrate a statutory claim, a party does not forego the substantive rights afforded by the statute; it only submits to their resolution in an arbi-tral, rather than a judicial, forum.”
 
 Id.
 
 The Sixth Circuit recently explained, however, that, “[njotwithstanding a general policy favoring [arbitration] agreements, there are circumstances under which courts will not enforce pre-dispute mandatory arbitration agreements with regard to statutory employment discrimination claims.”
 
 McMullen v. Meijer, Inc.,
 
 355 F.3d 485(6th Cir.2004).
 

 In
 
 Morrison v. Circuit City Stores, Inc.,
 
 317 F.3d 646 (6th Cir.2003), the Sixth Circuit set forth the standard for determining whether an arbitration agreement in an employment contract is enforceable with regard to statutory claims. The court observed that two considerations must be reconciled in this analysis: the “liberal federal policy favoring arbitration agreements” and the important rights created and protected by the federal civil rights
 
 *MIV
 
 legislation.
 
 Id.
 
 at 653-54, quoting
 
 Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,
 
 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). In
 
 Morrison,
 
 the court adopted a “case-by-case” approach to determine whether an arbitration provision is enforceable. The analysis is guided by an overall reference to state law contract principles.
 
 Andersons, Inc. v. Horton Farms, Inc.,
 
 166 F.3d 308, 322 (6th Cir.1998). In this case, Plaintiff Scovill presents numerous defenses to the enforceability of the arbitration provision. In the Court’s view, the defenses can be divided into two categories: contract defenses and other specific defenses. The Court considers each, in the context of these categories.
 

 A. Contract Defenses
 

 1. Meeting of the Minds
 

 Plaintiff argues that there was no meeting of the minds sufficient to sustain the arbitration provision. According to Plaintiff, he had no meaningful choice when asked by Defendants to sign the agreement.
 

 In general, there must be mutual assent or a “meeting of the minds” on all essential elements or terms of an agreement, in order to form a binding contract.
 
 See
 
 17A Am.Jur.2d.
 
 Contracts
 
 § 26 (2003). In
 
 Stout v. J.D. Byrider,
 
 228 F.3d 709 (6th Cir.2000), the Sixth Circuit held that “[w]hen asked by a party to compel arbitration under a contract, a federal court must determine whether the parties agreed to arbitrate the dispute at issue.”
 
 Id.
 
 at 714.
 

 While Plaintiff claims that he understood the agreement to be non-negotiable, according to Defendants, they have never refused to hire and has never fired an anchor who refused to accept its provisions.
 
 (Defendants’ Reply Memorandum in Support of Motion to Dismiss
 
 at 4; Hevel Tr. 39; Faber Tr. 28; Blevins Affidavit ¶ 4; Hevel Affidavit ¶ 6).
 

 Paragraph 13.2 of the Employment Agreement acknowledges that the prospective employee has been given the opportunity to discuss the Agreement with an attorney or advisor prior to signing it: “Employee represents and warrants that Employee has had the opportunity to discuss all aspects of this Agreement with a representative or attorney of Employee’s choice and that Employee has read and understands the meaning of each provision of this Agreement.” Plaintiff concedes that he did not consult an attorney or business advisor in this regard, but he did take time to look over the Agreement and discuss it with his wife. (Scovill Tr. 56-57). Plaintiff further acknowledges that he read the Agreement, understood the terms, and then signed it. (Scovill Tr. 54, 56-59).
 

 In Ohio, “[generally, when a party has signed an agreement, it must be presumed that he has accepted its terms.”
 
 See Rudd v. Online Resources, Inc.,
 
 1999 WL 397351, *4,1999 Ohio App. Lexis 2733, *11 (June 18, 1999). Under general contract principles, a person is presumed to be aware of what he signs, absent evidence of fraud, misrepresentation or deceit in the acceptance.
 
 See N & D Fashions, Inc. v. DHJ Industries, Inc.,
 
 548 F.2d 722 (8th Cir.1976). Accordingly, Plaintiffs signature on the Agreement reflects that he understood the terms of the Agreement and agreed to the same. Plaintiff is a well-educated and experienced news anchor. The Court has no basis upon which to conclude that Plaintiff was in a position of unequal bargaining power to the extent that he could reasonably believe that he had no opportunity to negotiate with his prospective employer. Consequently, the Court rejects Plaintiffs argument that
 
 *MV
 
 there was no meeting of the minds to support the formation of an agreement.
 

 2. Consideration
 

 Plaintiff argues that the agreement lacks consideration necessary to make it a binding contract. As with any contract, an arbitration agreement must be supported by adequate consideration in order to be enforceable.
 
 See Ford v. Tandy Transp., Inc.,
 
 86 Ohio App.3d 364, 620 N.E.2d 996, 1009 (1993). In Ohio, consideration may consist of either a detriment to the promisee or a benefit to the promi-sor.
 
 Id.
 
 In
 
 Harmon v. Philip Morris, Inc.,
 
 120 Ohio App.3d 187, 190-91, 697 N.E.2d 270, 272 (Ct.App.1997), the court ruled that an arbitration agreement requiring employees to submit their claims to arbitration but imposing no reciprocal obligation on the employer, and giving the employer the right to amend or terminate the arbitration program “at any time,” lacked consideration because it “neither offered a benefit to its employees nor incurred any detriment by modifying the terms of the employment relationship.” Similarly, in
 
 Century 21 American Landmark, Inc. v. McIntyre,
 
 68 Ohio App.2d 126, 129, 427 N.E.2d 534 (Ct.App.1980), the court stated that “a contract is illusory only when by its terms the promisor retains an unlimited right to determine the nature or extent of his performance; the unlimited right, in effect, destroys his promise and thus makes it merely illusory.”
 

 The arbitration provision in this case is unlike those in the contracts referred to in the two above-mentioned cases. The Agreement in this case clearly provides: “Employee and Employer agree that this arbitration shall be the exclusive means of resolving any dispute or controversy arising out of or relating to this Agreement, Employee’s employment with Employer, or termination of Employee’s employment, and that no other action will be brought by Employee in any other court or other forum.... ” In the context of arbitration agreements, where each side agrees to be bound by the obligation to arbitrate, such promises serve as adequate consideration.
 
 See Morrison v. Circuit City Stores, Inc.,
 
 70 F.Supp.2d 815, 823 (S.D.Ohio 1999),
 
 aff'd on other grounds,
 
 317 F.3d 646 (6th Cir.2003). Thus, the Court concludes that Plaintiffs defense of lack of consideration fails as a matter of law.
 

 3. Doctrine of Duress
 

 Plaintiff argues that his signature on the Employment Agreement was obtained by economic duress.
 
 (Plaintiff’s Memorandum Contra Defendants’ Motion to Dismiss
 
 at 34-35). More specifically, Plaintiff asserts that he feared that he would lose his job with Defendants, in light of a non-compete agreement and lack of comparable positions in Ohio, if he did not sign the Agreement and that this would hurt him financially.
 
 (Id.
 
 at 13, n. 22). However, Plaintiff readily admits that he was not threatened in any way if he refused to sign the Agreement. (Scovill Tr. 82).
 

 A person who claims to have been a victim of economic duress must show that he or she was subjected to a wrongful or unlawful act or threat, which deprived him or her of unfettered will.
 
 See Blodgett v. Blodgett,
 
 49 Ohio St.3d 243, 246, 551 N.E.2d 1249 (1990). The Sixth Circuit has held that absent a showing of fraud, duress, mistake, or some other ground upon which a contract may be voided, a court must enforce a contractual agreement to arbitrate.
 
 See Haskins v. Prudential Ins. Co. of America,
 
 230 F.3d 231, 239 (6th Cir.2000)
 
 holding limited by McMullen v. Meijer, Inc.,
 
 355 F.3d 485 (6th Cir.2004).
 

 
 *MVI
 
 To avoid a contract on the basis of duress, a party must prove coercion by the other party to the contract. It is not sufficient to show that one assented to the contract merely because of difficult circumstances.
 
 Id.
 
 In
 
 In Re American Casualty Co. v. City of Detroit,
 
 851 F.2d 794, 800 (6th Cir.1988), the Sixth Circuit held that an employee’s financial pressures do not constitute economic duress sufficient to void a contract. In
 
 Harsco Corp. v. Zlotnicki,
 
 779 F.2d 906, 911-912 (3d Cir.1985), the Third Circuit found that duress was highly unlikely when the party was given an unlimited time to consider and negotiate the contract and had the opportunity to consult with counsel or other advisors pri- or to signing the contract.
 

 The Court concludes that the evidence in this case is insufficient to support a finding of economic duress. Thus, the Court rejects Plaintiffs argument that the arbitration provision is unenforceable on this ground.
 

 4. Unconscionability
 

 Plaintiff argues that the arbitration clause is unenforceable because it is unconscionable.
 
 (Plaintiffs Memomn-dum Contra Defendants’ Motion
 
 at 18-34). Under Ohio law, the doctrine of uncon-scionability has two components: (1) substantive unconscionability,
 
 i.e.
 
 unfair and unreasonable contract terms and (2) procedural unconscionability,
 
 ie.
 
 individualized circumstances surrounding each of the parties to a contract such that no voluntary meeting of the minds was possible.
 
 Morrison v. Circuit City Stores, Inc.,
 
 317 F.3d 646, 666 (6th Cir.2003). Both elements must be present to find a contract unconscionable.
 
 Id.
 

 With respect to procedural uncon-scionability, Ohio courts look to “factors bearing on the relative bargaining position of the contracting parties, including their age, education, intelligence, business acumen and experience, relative bargaining power, who drafted the contract, whether the terms were explained to the weaker party, and whether alterations in the printed terms were possible.”
 
 Cross v. Carnes,
 
 132 Ohio App.3d 157, 169, 724 N.E.2d 828 (1998).
 

 In this case, the Court concludes that there is no set of facts that would entitle Plaintiff to relief from the arbitration agreement on the grounds of procedural unconscionability. It is undisputed that Plaintiff, who is educated and experienced in his chosen profession, possessed a level of bargaining power sufficient to avoid any aspect of procedural unconscionability. Thus, the Court rejects any relief Plaintiff seeks on this ground.
 

 With respect to substantive un-conscionability, the Court considers whether particular provisions of the contract are unreasonable or unfair. As stated in
 
 Garrett v. Hooters-Toledo,
 
 No. 3:03CV7053, 2003 WL 22989049 at *3 (N.D.Ohio Nov.24, 2003), substantive unconscionability involves “those factors which relate to the contract terms themselves and whether they are commercially reasonable.”
 

 In this case, Plaintiff argues that the arbitration provision is substantively unconscionable for a number of reasons. As stated above, under Ohio law, a contract is unconscionable only if it is both procedurally and substantively unconscionable.
 
 Morrison v. Circuit City Stores, Inc.,
 
 317 F.3d at 666, citing
 
 Jeffrey Mining Prods., L.P. v. Left Fork Mining Co.,
 
 143 Ohio App.3d 708, 758 N.E.2d 1173 (2001). Since this Court has found that Plaintiff can prove no set of facts to show that the arbitration provision is procedurally unconscionable, Plaintiffs unconscionability argument fails as a matter of law. Nevertheless, the Court will consider Plaintiffs arguments that certain provisions of the arbitration provision are substantively un
 
 *MVII
 
 conscionable in the context of the overall enforceability of the arbitration provision.
 
 [3]
 

 B. Other Specific Defenses
 

 1. Costs of Arbitration
 

 Plaintiff argues that the arbitration provision should not be enforced because the costs of arbitration are too high in comparison with litigation. With respect to costs, the agreement provides:
 

 Arbitration proceedings shall be held in the city or town where Employee’s employment services were performed, or at Employer headquarters or at any other location mutually agreed upon by Employee and Employer. The arbitrator shall determine the prevailing party in the arbitration
 
 and the costs of the arbitration shall be paid by the non-prevailing party.
 

 (Exhibit A at ¶ 15 attached to
 
 Defendants’ Motion to Dismiss or Stay)
 
 (emphasis added). In addition, Plaintiff claims that the provision allowing for an award of attorneys’ fees could make the costs of arbitration prohibitive. The agreement states:
 

 In the event of any action, proceeding or litigation ... between the parties arising out of or in relation to this Agreement, Employer, if the prevailing party in such litigation, shall be entitled to recover, in addition to any damages, injunctions, or other relief and without regard to whether the Action is prosecuted to final appeal, all of its costs and expenses including, without limitation, reasonable attorney’s fees from the non-prevailing party.
 

 CId.
 
 at ¶ 14.8).
 

 The issue of arbitration costs was addressed by the Sixth Circuit in the
 
 Morrison v. Circuit City
 
 case. There, the court held that “potential litigants must be given an opportunity, prior to arbitration on the merits, to demonstrate that the potential costs of arbitration are great enough to deter them and similarly situated individuals from seeking to vindicate their federal statutory rights in the arbitral forum.”
 
 Id.
 
 at 663. The court went on to explain:
 

 If ... a cost-splitting provision would deter a substantial number of potential litigants, then that provision undermines the deterrent effect of the anti-discrimination statutes. Thus, in order to protect the statutory rights at issue, the reviewing court must look to more than just the interests and conduct of a particular plaintiff. A particular plaintiff may be determined to pursue his or her claims, regardless of cost. But a court considering whether a cost-splitting provision is enforceable should consider similarly situated potential litigants, for whom costs will loom as a larger concern, because it is, in large part, then-presence in the system that will deter discriminatory practices....
 

 For this reason, if the reviewing court finds that the cost-splitting provision would deter a substantial number of similarly situated potential litigants, it
 
 *MVIII
 
 should refuse to enforce the cost-splitting provision in order to serve the underlying functions of the federal statute. In conducting this analysis, the reviewing court should define the class of such similarly situated potential litigants by job description and socioeconomic background. It should take the actual plaintiffs income and resources as representative of this larger class’s ability to shoulder the costs of arbitration.... Moreover, in addressing the effect of arbitration costs on a class, the reviewing court should look to average or typical arbitration costs, because that is the kind of information that potential litigants will take into account in deciding whether to bring their claims in the arbitral forum. In considering the decision-making process of the typical member of a class, it is proper to take into account the typical or average costs of arbitration.
 

 In analyzing this issue, reviewing courts should consider the costs of litigation as the alternative to arbitration ... but they must weigh the potential costs of litigation in a realistic manner. In many, if not most, cases, employees (and former employees) bringing discrimination claims will be represented by attorneys on a contingency-fee basis. Thus, many litigants will face minimal costs in the judicial forum, as the attorney will cover most of the fees of litigation and advance the expenses incurred in discovery. Thus, in many cases it might be concluded that, considering the costs incurred by the employee litigant, there is little or no difference between the expenses of the judicial and arbitral fora— with one important exception. In the arbitral forum, the litigant faces an additional expense—the arbitrator’s fee and costs—which are never incurred in the judicial forum....
 

 Finally, under this analysis, the reviewing court should discount the possibilities that the plaintiff will not be required to pay costs or arbitral fees because of ultimate success on the merits, either because of cost-shifting provisions in the arbitration agreement or because the arbitrator decides that such costs or fees are contrary to federal law. The issue is whether the terms of the arbitration agreement itself would deter a substantial number of similarly situated employees from bringing their claims in the arbitral forum, and thus the court must consider the decision-making process of these potential litigants. In many cases, if not most, employees considering the consequences of bringing their claims in the arbitral forum will be inclined to err on the side of caution, especially when the worst-case scenario would mean not only losing on their substantive claims but also the imposition of the costs of arbitration.
 

 This analysis will yield different results in different cases. It will find, in many cases, that high-level managerial employees and others with substantial means can afford the costs of arbitration, thus making cost-splitting provisions in such cases enforceable.... In the case of other employees, however, this standard will render cost-splitting provisions unenforceable in many, if not most, cases.
 

 Id.
 
 at 663-65 (internal citations omitted).
 

 The Court addresses the foregoing issues, in turn, in view of the evidence presented at the Evidentiary Hearing held to address these specific matters.
 

 a. Class of Similarly Situated Potential Litigants
 

 Plaintiff argues that the class of similarly situated potential litigants should be defined to include all “on-air talent” at WSYX and WTTE Fox 28. The Defendants argue that the class should be de
 
 *MIX
 
 fined to include only evening news anchors at WSYX and WTTE.
 

 At the Evidentiary Hearing, Mr. Michael Hevel, Account Manager for Columbus television station WCMH,
 
 [4]
 
 testified that news anchors are the highest paid category of employees at a television station. In contrast, news reporters, who report on stories in the field, are the lowest paid category of “on air” talent. The position of news reporter is typically an entry-level position. News reporters generally occupy two shifts: those who work on weekends and three week days, and those who work five week days. The next level of “on air” talent is the weekend news anchor. Weekend news anchors may be assigned to report on stories from the field on weekdays. The highest level of “on air” talent is the weekday news anchor. According to Hevel, weekday news anchors may also be assigned some reporting duties. Hevel testified that weekday news anchors are important because ratings are often determined by an anchor’s likeability, experience and talent.
 

 Mr. David Silverstein, who currently holds the position of News Director at Defendant WSYX/WTTE, also testified about the duties of television anchors and reporters. Silverstein characterized weekday news anchors as the “pinnacle of success,” as they have the most experience and talent. Weekday news anchors are also the highest paid category of “on air” talent.
 

 With respect to salaries of “on air” talent, Silverstein’s affidavit categorizes the salaries of employees at WSYX/WTTE by job title.
 
 [5]
 
 In 2002, Defendants employed seven weekday news anchors, with an average annual salary of $102,571. Defendants employed two weekend news anchors with an average annual salary of $50,000. Defendants employed seven reporters with an average salary of $55,939. The average annual salary of the seven reporters, with overtime, was $60,001. Sil-verstein testified at the hearing that, reporters may be called to fill-in for news anchors who are on vacation or who are on sick leave. Reporters usually only fill-in, however, if another anchor is unavailable to substitute.
 

 The Court notes that Plaintiff objects to the inclusion of an individual in the category of weekday news anchors who did not work in 2002, although his contract expired in 2002 and he was apparently paid a salary until his contract expiration.
 
 [6]
 
 Plaintiff argues that the inclusion of this anchor unduly inflates the average salary calculation. The Court disagrees. Since the anchor was paid a salary for some portion of 2002, although he did not actually anchor any news shows in that year, the Court finds inclusion of his salary in the yearly average calculation appropriate.
 

 In view of the evidence of record, the Court defines the class of similarly situated potential litigants as consisting of all weekday and weekend news anchors at WSYX / WTTE. The Court declines to include Reporters in this category because they are paid substantially less than news anchors and they perform different duties. In the Court’s view, this definition comports with the Sixth Circuit’s holding in
 
 Morrison v. Circuit City, supra
 
 that the
 
 *MX
 
 class should be defined by reference to “job description and socioeconomic background” while also taking into account the “actual plaintiffs income as representative of this larger class’s ability to shoulder the costs of arbitration.” 317 F.3d at 663.
 

 With the class of employees defined, the Court now considers the what the average or typical costs of arbitration are.
 

 b. Average or Typical Costs of Arbitration
 

 At the Evidentiary Hearing, Plaintiff offered an exhibit as to the average costs of arbitration using an American Arbitration Association [“AAA”] arbitrator. According to Plaintiff, two categories of fees are generally incurred in this regard: AAA administrative fees and AAA arbitrator fees. (Def. Exhibit 44). With respect to administrative fees, the Plaintiff pays an initial filing fee of, in general, either $3,250 for a claim with an unstated value, or $4,250 for a $300,000 claim. In addition, there is a case service fee of $1,250 for a claim valued at $300,000 or a case service fee of $750 if the claim does not state its value. Finally, there is a room rental fee of, in general, $150 per day.
 
 (Id.).
 
 In addition, the Plaintiff estimates the arbitrator’s fees to range from $10,710 to $14,490, based on a four day arbitration hearing. In total, Plaintiff estimates the average or typical costs of arbitration as being between $15,310 to $20,590.
 
 [7]
 

 (Id.).
 
 The range could be higher, however, depending on the length of the arbitration hearing and time spent by the arbitrator in rendering a decision. Nevertheless, it appears undisputed that the cost is, at a minimum, $15,310.
 

 Plaintiff argues that the foregoing cost is prohibitive because it amounts to between 4 or 5% of Plaintiffs salary. Plaintiff further argues that the cost is even more prohibitive considering that payment is required at a time when Plaintiff is not earning a salary. In 2002, Plaintiff Scovill, who has three children to support, started his own business. The business generated a paltry income at its inception. Plaintiffs taxable income consisted mainly of disability benefits received. Based upon these figures, which Plaintiff has submitted to the Court pursuant to a protective order, Plaintiff estimates the costs of arbitration to be nearly 400 % of his income in 2002.
 

 In support of his position that the costs of arbitration are unduly burdensome, Plaintiff relies on the
 
 Morrison
 
 court’s observation that, whether the cost is prohibitive “must be considered from the vantage point of the potential litigant;”
 
 i.e.,
 
 taking into account that fact that being recently terminated, the litigant “must continue to pay for housing, utilities, transportation, food and the other necessities of life in contemporary society despite losing [his or] her primary and most likely, only source of income.”
 
 Morrison,
 
 317 F.3d at 669.
 

 The arbitration agreement in
 
 Morrison
 
 provided that the plaintiff was to pay the initial filing fee of $75 and then Circuit City would pay all other costs of arbitra
 
 *MXI
 
 tion but, each party was required to pay half of the costs following issuance of the arbitration award unless the arbitrator decided that the losing party should bear all costs.
 
 Id.
 
 at 654-55. In addition, the agreement provided that all costs of arbitration were to be paid within ninety days of the award. If, however, the employee was unable to pay his or her share, the amount would be limited to “the greater of either five hundred dollars or three percent of her most recent annual compensation.”
 
 Id.
 
 at 655. Each side was also responsible for his or her own attorney’s fees.
 
 Id.
 
 Morrison was a managerial level employee at Circuit City, earning an annual salary of $54,060.00. Circuit City argued that the cost of arbitration was not prohibitive for Morrison because “at most, she would have been required to pay $1,622 [3'% of her annual salary] for the arbitral forum.”
 
 Id.
 
 at 669.
 

 In analyzing the issue, the Sixth Circuit concluded that Circuit City’s cost splitting provision “would deter a substantial percentage of potential litigants from bringing their claims in the arbitral forum.”
 
 Id.
 
 The court further concluded that the provision limiting the employee’s exposure to the greater of $500 or three percent of the employee’s salary, did not change the analysis. “Faced with this choice — which really boils down to risking one’s scarce resources in the hopes of an uncertain benefit — it appears to us that a substantial number of similarly situated persons would be deterred from seeking to vindicate their statutory rights under these circumstances.”
 
 Id.
 
 at 669-70.
 

 The court noted, however, that the “analysis will yield different results in different cases. It will find, in many cases, that high-level managerial employees and others with substantial means can afford the costs of arbitration, thus making cost-splitting provisions in such cases enforceable .... In the case of other employees, however, this standard will render cost-splitting provisions unenforceable in many, if not most, cases.”
 
 Morrison,
 
 317 F.3d at 665. In view of the Sixth Circuit’s holding, this Court is not prepared to rule, as Plaintiff suggests, that any time the costs of arbitration exceed three percent of the employee’s salary that the costs are prohibitive. Rather, it is clear that the Court must engage in a case-by-case analysis, placing particular emphasis on the Plaintiffs financial means and his status as a representative of the larger class of similarly situated potential litigants.
 

 Before resolving how the analysis applies to Plaintiff Scovill and whether the potential costs of arbitration are indeed prohibitive, the Court considers what the costs of litigating would likely be.
 

 c. Potential Costs of Litigation
 

 This Court has little difficulty assessing the potential costs of litigation since it has considered many employment discrimination cases as well as requests for costs and fees in such cases. As the Sixth Circuit observed in
 
 Morrison,
 
 most employees in employment discrimination cases are represented by an attorney on a contingency fee basis. Accordingly, the initial costs of litigating are minimal, aside from the $150 filing fee in this Court. Furthermore, in contrast with the arbitral forum, a litigant never incurs a room rental fee or hourly fee from the judge when litigating. Typically, an unsuccessful Plaintiff is not required to pay the prevailing party’s attorney’s fees, but would likely be assessed costs, which can range from $1,000 to over $4,000. It is also typical for a Plaintiffs attorney to advance the Plaintiffs costs while the case is litigated in either an arbitral or a judicial forum. Nevertheless, as the Sixth Circuit held, courts are to consider whether the “expenses of the differing fora would deter potential litigants
 
 *MXII
 
 from bringing their statutory claims in the arbitral forum.”
 
 Morrison,
 
 317 F.3d at 664. Stated differently, the issue “is not the fact that the fees would be paid to the arbitrator ... but rather whether the overall cost of arbitration from the perspective of the potential litigant is greater than the cost of litigation in court.”
 
 Id.
 
 (internal quotation and citation omitted).
 

 d. Conclusion
 

 In view of the foregoing, the Court concludes that the costs of arbitration, viewed from the perspective of the Plaintiff and the relevant class of news anchors, is prohibitive in comparison to the costs of litigation. In reaching this conclusion, the Court observes that, while Plaintiff earned a relatively substantial salary during his tenure with the Defendants, given the overall circumstances of Plaintiffs employment, the salary is not as significant as it may appear.
 

 It is undisputed that the position of news anchor is the highest level of achievement one reaches in television broadcast journalism. Whether an employee remains in the position can be unpredictable, however, since a variety of factors influence a station’s decision to elevate an employee to news anchor. As the evidence presented at the hearing demonstrated, the anchor’s likability, involvement in the community, and ratings all influence the stability of the position. Furthermore, the salary earned by an employee in the news anchor position comes only after some time of earning a substantially smaller salary as a reporter. It is also clear in this case, from Defendants’ own witnesses, that on-air personalities must frequently change positions and work from network to network. The position has very little job security, which imposes economic costs that diminish the value of a short term job. Given these circumstances, the Court does not view the salary, standing alone, of a news anchor as necessarily determinative of the Plaintiffs or the larger class of news anchors’ ability to shoulder the costs of arbitration.
 

 In addition, based upon the evidence presented as to Plaintiffs income and resources following the termination of his employment, the Court concludes that the costs of arbitration contemplated by the agreement are prohibitive. As noted above, Plaintiff has three children and a new business, all of which require a great deal of financial support. The costs of arbitration, which would be at a minimum $15,000, are to be incurred at a time when Plaintiffs salary as a news anchor would not be forthcoming. While it may be that some individuals could have saved a portion of their salaries after having attained the position of news anchor, given the unpredictable nature of the job, the Court will not presume that every news anchor has amassed a substantial enough savings to afford the necessities of life and also afford the costs of arbitration. Furthermore, the evidence in this case does not show that Plaintiff Scovill had amassed a great enough amount of resources to afford the costs of arbitration.
 

 For these reasons, the Court concludes that the provisions for cost-shifting and potential payment of the employer’s attorney’s fees contained in the arbitration provision in this case present a substantial deterrent to arbitration for the defined class of potential litigants in this case. Based on the facts and evidence adduced, the costs of arbitration are prohibitive to the Plaintiff as well as to the class of similarly situated potential litigants. Accordingly, the Court finds the cost provisions unenforceable. The Court will consider the effect of this conclusion, in the context of the severability issue,
 
 infra.
 

 2. Statute of Limitations
 

 Plaintiff also argues that the arbitration provision is unenforceable because
 
 *MXIII
 
 it shortens the limitations period for advancing a claim under the ADEA. The agreement states, in relevant part:
 

 If Employee decides to submit to arbitration any dispute or controversy arising out of or relating to this Agreement, Employee’s employment with Employer, or termination of Employee’s employment, including, but not limited to claims based on common law, contract, or statutorily created or protected rights, Employee agrees to deliver a written request for arbitration to the Employer within three (3) months of the date of the event or occurrence giving rise to such dispute or controversy .... If Employer does not receive a written request for arbitration from Employee within three (3) months from the date of the event or occurrence giving rise to such dispute or controversy ... Employee agrees Employee will have waived any right to raise any claims arising out of any dispute or controversy arising out of Employee’s employment with Employer, or termination of Employee’s employment, including, but not limited to claims based on common law, contract, or statutorily created or protected rights, in arbitration or in any court or other forum. The limitations set forth in this paragraph shall not be subject to tolling, equitable or otherwise.
 

 (Exhibit A at ¶ 15).
 

 Plaintiff points out that, under the ADEA, he has three-hundred days from the date of discrimination to file a charge of discrimination. After the charge is filed, Plaintiff has ninety days from receipt of a right to sue letter to commence action in federal court. Plaintiff argues that the shortened limitations period contained in the arbitration provision denies him the full range of remedies otherwise available under the statute and therefore renders the agreement unenforceable. In response, the Defendants rely on the fact that Ohio law permits parties to contractually agree to shorten the limitations period for bringing statutory, contractual or common law claims against the other.
 

 While Defendants’ statement of the law is correct, the issue in such an instance is whether a shortened limitations period is reasonable. The district court in
 
 Morrison v. Circuit City Stores, Inc., supra,
 
 concluded that a one year period for commencing arbitration, although shorter than the time Plaintiff would otherwise have to sue under Title VII, was reasonable. As the Sixth Circuit has explained, in general, “contractual agreements providing for a shorter limitations period than that provided by statute are enforceable unless they are so clearly oppressive that enforcement would be demonstrably unfair.”
 
 Ciraulo v. AT & T Information Systems, Inc.,
 
 No. 97-1021, 1998 WL 252748 at *3 (6th Cir. May 13, 1998).
 

 In this case, the Court concludes that it need not decide the issue of whether the limitations period of three months is reasonable. It is undisputed that the Defendants have not raised the statute of limitations as a defense. At oral argument, the Defendants have represented that they will not raise the issue before an arbitrator, given the fact that the Plaintiff filed this case within the three month period. Thus, the Plaintiffs arguments on the matter are moot.
 

 3. Remedies
 

 Plaintiff argues that the provision of the Agreement which provides that he pay all of the Employers “costs and expenses including, without limitation, reasonable attorney’s fees” if he is unsuccessful in any “proceeding or litigation ... between the parties arising out of or in relation to [the] Agreement ...” (Exhibit A at ¶ 14.7), should not be enforced because it is contrary to the ADEA. As the Plaintiff points out, under the ADEA, he is
 
 *MXIV
 
 entitled to recover his fees and costs from the other side if he prevails on his age discrimination claim. 29 U.S.C. § 626(b)
 
 [8]
 
 . The statute makes no provision for a losing Plaintiff to pay the other side’s fees and expenses if unsuccessful.
 

 In
 
 Morrison v. Circuit City Stores, Inc., supra,
 
 the Sixth Circuit stated that “[i]t is well-established that ‘a party does not forgo the substantive rights afforded by [a] statute [when she agrees to arbitrate a statutory claim but] only submits to their resolution in an arbitral, rather than a judicial forum.’ ”
 
 Morrison,
 
 317 F.3d at 670, quoting
 
 Gilmer,
 
 500 U.S. at 26, 111 S.Ct. 1647. In applying this principle, the court concluded that the limitation of damages provision contained in the Circuit City arbitration agreement
 
 [9]
 
 was unenforceable because it required a plaintiff to forego the “full panoply of remedies under Title VII and ... thereby contravene[d] Congress’s intent to utilize certain damages as a tool for compensating victims of discrimination and for deterring employment discrimination more broadly.”
 
 Id.
 
 at 669. The court stated that, in considering a limitation of remedies provision, the “critical question is not whether a claimant may obtain
 
 some-
 
 amount of the entire range of remedies under Title VII, but whether the limitation on remedies at issue undermines the rights protected by the statute.”
 
 Id.,
 
 citing
 
 Gilmer,
 
 500 U.S. at 26-27, 111 S.Ct. 1647.
 

 In this case, the Agreement does not limit the panoply of remedies available to Plaintiff should he prevail on his claim in arbitration. The Agreement does, however, require Plaintiff to pay Defendants’ fees and costs if he is unsuccessful. Defendants argue that this provision is independent of the arbitration provision and should be upheld because parties may lawfully agree to indemnify the prevailing party’s attorney’s fees. In support of this position, Defendants cite Ohio contract law cases.
 

 In
 
 Nottingdale Homeowners’ Association, Inc. v. Darby,
 
 33 Ohio St.3d 32, 514 N.E.2d 702 (1987), the Ohio Supreme Court held that a provision in a declaration of condominium ownership requiring a defaulting unit owner to pay attorney fees incurred by the unit owner’s association in a foreclosure action was enforceable. In reaching this conclusion, the court reasoned:
 

 As can be seen, the fee-shifting agreement in this case protects the fund of the unit owners’ association from potential bankruptcy, and the conscientious contributors thereto from the burden of paying for the delinquency of others. Without such fee-shifting agreements, unit owners’ associations may have to abandon claims against debtors, such as appellees, as too costly to pursue. With such agreements, the debtor will be encouraged to pay to avoid litigation, and if litigation becomes necessary, the association’s resources will be protected if its suit proves meritorious. A more ideal arrangement can scarcely be imagined.
 

 Id.
 
 at 37, 514 N.E.2d 702. The holding was later applied in the context of a commercial foreclosure, where the mortgage agreement contained a fee-shifting agreement.
 
 Gaul v. Olympia Fitness Center,
 
 
 *MXV
 

 Inc.,
 
 88 Ohio App.3d 310, 623 N.E.2d 1281 (1993).
 

 The Court concludes that, despite the ability of parties to a contract to agree to pay the other side’s fees if unsuccessful on a claim arising from the contract, in the employment context, such a provision tends to undermine the remedial purpose of the anti-discrimination statutes. As stated above, “arbitration is merely a choice of dispute resolution and does not infringe upon statutory protections.”
 
 Spinetti v. Service Corporation International,
 
 324 F.3d 212, 216 (3rd Cir.2003). Since Plaintiff would not be faced with the prospect of paying the Defendants’ attorneys’ fees and costs if unsuccessful in this Court on his ADEA claim, unless the Defendants successfully established that the suit was brought in bad faith, or was otherwise improperly motivated, he should not be required to do so if unsuccessful in arbitration. Consequently, the Court finds ¶ 14.8 unenforceable in the arbitration context. In arbitration, the arbitrator shall apply the provisions of the ADEA, and any narrow, but otherwise applicable, fee-shifting provisions of law as would be available if this case were litigated in federal court.
 

 4. Standard for Discrimination under the Arbitration Agreement
 

 At the Evidentiary Hearing, the parties addressed the issue raised by the Court as to whether certain provisions of the Arbitration Agreement change the substantive standard of an ADEA claim. The provisions state:
 

 In any case involving alleged violation of Section 8 of this Agreement [Termination of Employment] by Employer, the Arbitrator shall be made aware of the following:
 

 (a)Television Anchor/Reporters provide special and unique services to television stations in that the personality of an Anchor/Reporter may greatly influence the popularity and market share of the station.
 

 (b) If the Anchor/Reporter presents a personality or performance which is unattractive to viewers or sponsors, the station may lose viewers and/or sponsors, ratings and market share, thus experiencing losses which may be detrimental to the operation and which it may take years for the station to regain.
 

 (c) The value of an Anchor/Reporter’s services to a television station can become a negative factor for Employer if the Anchor/Reporter is perceived by viewers or sponsors to have engaged in conduct indicative of a lack of due regard for the best interests of the station, social conventions or public morals and decency. An Anchor/Reporter’s involvement or apparent involvement in such an occurrence which tends to degrade the station in society, to bring the Anchor/Reporter into public disrepute or to cause embarrassment to the station can have a serious detrimental effect on the station’s ratings, market share, popularity with viewers and ability to attract and retain sponsors for news and other programs and to operate profitably.
 

 (d) As a result of the above, Employer has a serious and legitimate business interest in the appearance, presented personality and public perception of Anchor/Reporters. Therefore the Arbitrator should be aware of the following principles:
 

 (I) it is Employer’s right in its sole and absolute discretion to determine the quality of the performance being given by an Anchor/Reporter and Employer has the right to command a high level of professionalism from performers in these positions; and
 

 (ii) if the Arbitrator is satisfied that Employee did engage in the conduct complained of, or if the Arbitrator is satisfied that Employer reasonably believed that Employee engaged in the
 
 *MXVI
 
 conduct complained of, the Arbitrator is not to determine what discipline she of he would have taken had she or he been in the position of Employer, but rather the Arbitrator must uphold the action taken by Employer.
 

 (Exhibit A at ¶ 15).
 

 This standard alters the traditional burden-shifting method employed for proving an ADEA claim in this Court.
 
 [10]
 
 Using the indirect method of proof, once the Plaintiff establishes a
 
 prima facie
 
 case of discrimination
 
 [11]
 
 , the burden of production shifts to the Defendant to present a legitimate, nondiscriminatory reason for the adverse employment action.
 
 McDonnell Douglas Corp. v. Green,
 
 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973);
 
 Barnett v. Dep’t of Veterans Affairs,
 
 153 F.3d 338, 341 (6th Cir.1998). If the Defendant satisfies this burden, the Plaintiff must then show, by a preponderance of the evidence, that the Defendant’s proffered reason was a pretext for age discrimination.
 
 Id.
 
 In order to show pretext, the Plaintiff can demonstrate “either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the [adverse action], or (3) that they were insufficient to motivate [adverse action].”
 
 Manzer v. Diamond Shamrock Chemicals Co.,
 
 29 F.3d 1078, 1083 (6th Cir.1994) (internal quotations and citations omitted). In this type of rebuttal showing, the Plaintiff may not rely simply upon his
 
 prima facie
 
 evidence, but must introduce additional evidence of discrimination.
 
 Id.
 
 at 1084.
 

 Plaintiffs showing of pretext, combined with proof of a
 
 prima facie
 
 case for discrimination, does not necessarily lead to the conclusion of unlawful discrimination. There may be instances where “no rational factfinder could conclude that the action was discriminatory.”
 
 Reeves v. Sanderson Plumbing Products, Inc.,
 
 530 U.S. 133, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105 (2000). Thus, proof of a
 
 prima facie
 
 case and sufficient evidence to reject the employer’s explanation
 
 may
 
 permit a finding of liability.
 
 Id.
 
 In addition, although the burden of production shifts under the
 
 McDonnell Douglas
 
 analysis, the burden of persuasion remains at all times with the Plaintiff.
 
 See St. Mary’s Honor Ctr. v. Hicks,
 
 509 U.S. 502, 528, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).
 

 The Defendants in this case argue that the change in analysis for an age discrimination claim, contained in ¶ 15 of the Arbitration agreement, is permissible. The Court disagrees. As stated
 
 supra,
 
 when a claim proceeds to arbitration, it effects merely a change in fora, not in substantive law applied. Accordingly, to the extent ¶ 15 of the Arbitration agreement changes the evidential standard normally applied in the context of an employment discrimination claim, the provision is unenforceable.
 

 5. Older Workers Benefit Protection Act
 

 Plaintiff claims that the arbitration provision violates the Older Workers Benefit Protection Act [“OWBPA”], 29 U.S.C. § 626.
 
 [12]
 
 The OWBPA states that
 
 *MXVII
 
 “[a]n individual may not waive any right or claim under this chapter unless the waiver is knowing and voluntary.” 29 U.S.C. § 626(f)(1). The phrase “this chapter” refers to chapter 14 of title 29 of the United States Code,
 
 i.e.,
 
 the ADEA. The OWBPA makes specific requirements for the release of claims under the ADEA. The statute provides:
 

 (f) Waiver
 

 (1) An individual may not waive any right or claim under this chapter unless the waiver is knowing and voluntary. Except as provided in paragraph (2), a waiver may not be considered knowing and voluntary unless at a minimum-
 

 (A) the waiver is part of an agreement between the individual and the employer that is written in a manner calculated to be understood by such individual, or by the average individual eligible to participate;
 

 (B) the waiver specifically refers to rights or claims arising under this chapter;
 

 (C) the individual does not waive rights or claims that may arise after the date the waiver is executed;
 

 (D) the individual waives rights or claims only in exchange for consideration in addition to anything of value to which the individual already is entitled;
 

 (E) the individual is advised in writing to consult with an attorney prior to executing the agreement;
 

 (F)(i) the individual is given a period of at least 21 days within which to consider the agreement; or
 

 (ii) if a waiver is requested in connection with an exit incentive or other employment termination program offered to a group or class of employees, the individual is given a period of at least 45 days within which to consider the agreement;
 

 (G)the agreement provides that for a period of at least 7 days following the execution of such agreement, the individual may revoke the agreement, and the agreement shall not become effective or enforceable until the revocation period has expired ....
 

 29 U.S.C. § 626(f).
 

 Plaintiff alleges that the arbitration provision fails to meet the foregoing requirements and is therefore unenforceable. The Defendants contend that the failure is of no moment because Plaintiff has not been required to waive a claim under the ADEA, but rather to submit his claim to arbitration.
 

 In support of his position, Plaintiff relies on
 
 Hammaker v. Brown & Brown, Inc.,
 
 214 F.Supp.2d 575 (E.D.Va.2002). In that case, Plaintiff commenced an action for discrimination under the ADEA and sought a jury trial. Defendant argued that Plaintiff waived his right to a jury trial by virtue of a provision in the employment agreement which stated that the employee and employer “hereby knowingly, voluntarily and intentionally waive any right either may have to a trial by jury with respect to any litigation related to or arising out of, under or in conjunction with this Agreement.”
 
 Id.
 
 at 577. In considering this provision, the court first concluded that the agreement covered the Plaintiffs ADEA claim. The court then considered whether the requirements of the OWBPA applied to the Plaintiffs waiver of the right to jury trial.
 
 [13]
 
 In this analysis, the court observed that cases involving the enforceability of arbitration provisions were inap-posite because the Plaintiffs “ADEA claim
 
 *MXVIII
 
 will be heard in a judicial forum, whether by bench trial or jury trial.”
 
 Id.
 
 at 579. For this reason, the decision in
 
 Hammaker
 
 is not helpful in resolving Plaintiffs claim.
 

 The impact of the OWBPA on arbitration of an ADEA claim has been considered by a number of courts. In
 
 DeLuca v. Bear Stearns & Co., Inc.,
 
 175 F.Supp.2d 102 (D.Mass.2001), the court held that arbitration of claims under Title VII and the ADEA is not precluded by the OWBPA but, “[t]o enforce such an arbitration agreement ... the employee must receive some minimal level of notice that her statutory claims will be subject to arbitration.”
 
 Id.
 
 at 116, citing
 
 Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,
 
 170 F.3d 1 (1st Cir.1999);
 
 Ramirez-De-Arellano v. American Airlines, Inc.,
 
 133 F.3d 89 (1st Cir.1997). In addition, the Supreme Court has stated, albeit in
 
 dictum,
 
 that the OWBPA “did not explicitly preclude arbitration” of ADEA claims.
 
 Gilmer v. Interstate
 
 /
 
 Johnson Lane Corp.,
 
 500 U.S. 20, 29, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991).
 

 In this case, Plaintiff clearly had notice that any claim against his employer, including a statutory claim, would be subject to arbitration. Moreover, the Court concludes that the OWBPA does not preclude the enforcement of an agreement to arbitrate an ADEA claim. As the court observed in
 
 Hammaker, supra,
 
 Plaintiff is not waiving his right to bring an age discrimination claim; he is simply agreeing that it will be pursued in a different forum. Therefore, this Court concludes that Plaintiffs claim for violation of the OWBPA fails as a matter of law.
 

 6. 1991 Amendments to the Civil Rights Act
 

 Plaintiff claims that, based on the 1991 amendments to the Civil Rights Act, ADEA claims are not subject to arbitration. In support of this position, Plaintiff relies on the Ninth Circuit’s decision in
 
 Duffield v. Robertson Stephens & Co.,
 
 144 F.3d 1182 (9th Cir.1998). In that case, the court concluded that the 1991 Civil Rights Act precluded arbitration of statutory employment discrimination claims. The decision was later overruled by
 
 EEOC v. Luce, Forward, Hamilton & Scripps,
 
 345 F.3d 742 (9th Cir.2003). There, the Ninth Circuit noted that § 118 of the Act states that “the use of alternative means of dispute resolution, including ... arbitration, is encouraged to resolve disputes arising under the [1991] Acts or provisions of Federal law amended by this title.”
 
 Id.
 
 at 751.
 

 As the Defendants point out, aside from the now overruled decision in
 
 Duffield,
 
 no court has held that arbitration is precluded by the 1991 amendments to the Civil Rights Act. Thus, this Court concludes that Plaintiffs claim based on the 1991 amendments fails as a matter of law.
 

 IV.
 

 With the Plaintiffs challenges to the arbitration provision resolved, the Court now considers whether the objectionable provisions may be severed from the remainder of the agreement. The Agreement provides as follows:
 

 14.7
 
 Severability.
 
 All rights, powers and remedies provided herein may be exercised only to the extent that the exercise thereof does not violate any applicable laws and are intended to be limited to the extent necessary so that they will not render this Agreement invalid or unenforceable. If any term or provision of this Agreement shall be held to be invalid, illegal, or unenforceable, the legality, validity, and enforceability of the other terms and provisions shall in no way be affected thereby and said illegal, unenforceable or invalid
 
 *MXIX
 
 term or provisions shall be deemed not to be part of this agreement.
 

 (Exhibit A at ¶ 14.7).
 

 In addition, the arbitration provision states:
 

 Employee and Employer agree that if any court of competent jurisdiction declares that any part of this arbitration provision is illegal, invalid or unenforceable, such a declaration will not affect the legality, validity or enforceability of the remaining parts of the arbitration provision and the illegal, invalid or unenforceable part will no loner be part of this arbitration provision.
 

 (Exhibit A at ¶ 15).
 

 Despite the foregoing, Plaintiff argues that this Court should not sever any provision of the Agreement and should refuse to enforce the entire agreement. The Defendants take a contrary position.
 

 In
 
 Morrison v. Circuit City Stores, Inc., supra,
 
 the Sixth Circuit observed that, under Ohio law, the severability of a contractual provision is a “question of law and depends on the intent of the parties.”
 
 Morrison,
 
 317 F.3d at 674, citing
 
 Toledo Police Patrolmen’s Ass’n v. City of Toledo,
 
 94 Ohio App.3d 734, 641 N.E.2d 799 (1994). Furthermore, the court held that “when the arbitration agreement at issue includes a severability provision,
 
 courts should not lightly conclude that a particular provision of an arbitration agreement taints the entire agreement.” Id.
 
 at 675 (emphasis added), citing
 
 Great Earth Cos. v. Simons,
 
 288 F.3d 878, 890-91 (6th Cir.2002).
 

 In this case, the parties’ intent to sever unenforceable provisions of the Agreement is clearly manifested by the language of the agreement itself. Moreover, in accordance with Sixth Circuit precedent, the Court declines to find the whole agreement tainted simply because certain provisions are unenforceable. Accordingly, for the reasons stated above, the Court concludes that the cost-shifting provision, the remedies provision, and the evi-dentiary standard provision are all severa-ble from the agreement. Upon proceeding to arbitration, the parties shall be subject to the same substantive law and remedies regarding age discrimination that would apply in this Court. The agreement to arbitrate a statutorily-created claim means only that the forum, not the law, has changed.
 

 With respect to the costs of arbitration, this Court concludes that Plaintiff shall pay the initial filing fee, while the total costs shall be paid by the Defendants. Costs incurred, by either party, shall be apportioned by the arbitrator after the decision applying the same substantive law on costs which would be applicable had this case been tried under the ADEA in federal district court.
 

 Y.
 

 In light of the foregoing, the Defendants’ Motion to Dismiss (Doc. # 38) is GRANTED subject to the conditions set forth above. The Plaintiffs Motion for an Extension of Time (Doc. # 36) is MOOT. The Plaintiffs Motion to Strike (Doc. # 58) is DENIED.
 

 The Clerk is DIRECTED to Close this case and remove the preceding motions from the Court’s pending motions list.
 

 IT IS SO ORDERED.
 

 [1]
 

 . Section 12 is inapplicable to any of the claims asserted in Plaintiff's complaint.
 

 [2]
 

 . Nevertheless, this Court notes its decision in
 
 Hess v. Anheuser-Busch Companies, Inc.,
 
 No. 2:01-CV-533, 2002 WL 483564 (S.D.Ohio March 27, 2002), holding that an arbitration agreement contained in a collective bargaining agreement did not waive a plaintiffs right to litigate a statutory claim in federal court. The Supreme Court has refused to compel arbitration of statutory claims when the agreement to arbitrate is contained in a collective bargaining agreement.
 
 See Alexander v. Gardner-Denver Co.,
 
 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974).
 

 [3]
 

 . The Court notes that there is a difference of opinion on the issue of whether the “prohibitive cost” defense to enforcement of an arbitration provision is analyzed in the context of unconscionability. In
 
 Garrett v. Hooters-Toledo,
 
 No. 295 F.Supp.2d 774, 780 n. 2 (N.D.Ohio 2003), the court agreed with the decision in
 
 Ting v. AT & T,
 
 182 F.Supp.2d 902 (N.D.Cal.2002), that a contractual provision which prevents one from vindicating a statutory or non-statutory right, is substantively unconscionable. The court in
 
 Camacho v. Holiday Homes, Inc.,
 
 167 F.Supp.2d 892 (W.D.Va.2001), reached a contraty conclusion, holding that the defense of prohibitive costs stands apart from the unconscionability analysis. In
 
 Morrison v. Circuit City Stores, Inc., supra,
 
 the Sixth Circuit appeared to analyze the prohibitive cost defense apart from the unconscionability doctrine. Thus, this Court engages in the same analysis.
 

 [4]
 

 . Prior to his position at WCMH, Hevel worked as an Account Executive at WSYX/ WTTE for three years and, prior to that, he held the position of News Director.
 

 [5]
 

 . Silverstein uses the year 2002 since Plaintiff's employment ended on May 17, 2002.
 

 [6]
 

 .Defendants represent that the reporter was paid a salary for three months in 2002. Plaintiff does not necessarily dispute this, but notes that he has seen no evidence to support the payment. Defendants have submitted evidence under seal that supports the payment. Thus, Plaintiff's objection is without merit.
 

 [7]
 

 . Defendants argue that use of non-AAA arbitration is permissible and would result in a lesser cost. According to Defendants, they have generally been able to agree with former employees to use non-AAA arbitrators and only resort to AAA arbitrators when an agreement cannot be reached.
 
 (See Defendants' Reply Memorandum
 
 at 38). In the Court's view, while this method may be preferable, because the arbitration agreement provides that arbitrators are to be "bound by the qualifications and disclosure provisions and the procedures set forth in the 1989 Model Employment Procedures of the American Arbitration Association,” the Court judges the costs of arbitration by use of a AAA arbitrator. Using the lower costs estimated by the Defendants as to arbitrators not designated by the AAA results in a lower cost, but not so low as to change the analysis contained herein.
 

 [8]
 

 . The statute provides that its provisions shall be enforced in accordance with,
 
 inter alia,
 
 29 U.S.C. § 216, which provides for the recovery of damages, attorney’s fees and costs.
 

 [9]
 

 . The agreement limited the plaintiff's remedies to injunctive relief, including reinstatement; one year of backpay and reimbursement for lost fringe benefits; two years of front pay if reinstatement is not possible; compensatory damages in accordance with applicable law; and punitive damages up to $5000 or the sum of a claimant's backpay and front pay awards, whichever is greater.
 
 Morrison,
 
 317 F.3d at 670-71.
 

 [10]
 

 . As the parties are aware, an ADEA claim can be proven with either direct or indirect evidence. If the latter method is used, the burden-shifting method of proof, set forth in
 
 McDonnell Douglas Corp. v. Green,
 
 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), applies.
 

 [11]
 

 . This requires showing that: (1) Plaintiff is a member of a protected class,
 
 i.e.,
 
 over the age of forty; (2) that he suffered an adverse employment action; (3) that he was otherwise qualified for the position; and (4) that a person substantially younger than the Plaintiff either replaced or was chosen instead of Plaintiff.
 
 See Brown v. Renter’s Choice,
 
 55 F.Supp.2d 788, 791 (N.D.Ohio 1999).
 

 [12]
 

 .Congress enacted the statute as an amendment to the ADEA to ensure that workers would not carelessly waive a potential ADEA
 
 *MXVII
 
 claim.
 
 See Oubre v. Entergy Operations, Inc., 522
 
 U.S. 422, 426-26, 118 S.Ct. 838, 139 L.Ed.2d 849 (1998).
 

 [13]
 

 . Ultimately, the court held that waiver of the right to a jury trial was required to conform to the OWBPA.